J-S22016-16 & J-S22017-16

2016 PA Super 162

| IN THE INTEREST OF: K.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: D.S. & L.S. | |
| | No. 1975 MDA 2015 |

Appeal from the Decree entered October 14, 2015,
in the Court of Common Pleas of Lackawanna County,
Orphans' Court, at No(s): A77-2013.

| IN THE INTEREST OF: K.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: LACKAWANNA COUNTY OFFICE OF YOUTH AND FAMILY SERVICES | |
| | No. 1983 MDA 2015 |

Appeals from the Decree entered October 14, 2015,
in the Court of Common Pleas of Lackawanna County,
Orphans' Court, at No(s): A77-2013.

BEFORE:  MUNDY, DUBOW, and STRASSBURGER,* JJ.

OPINION BY DUBOW, J.:                    **FILED JULY 22, 2016**

*Retired Senior Judge assigned to the Superior Court.

D.S. and L.S. ("Pre-Adoptive Parents") and the Lackawanna County Office of Youth and Family ("the Agency") appeal from the Decree that the Orphan's Court entered granting the Petition to Adopt K.D. ("Child") that the Child's maternal grandmother, E.D. ("Grandmother"), filed pursuant to the Adoption Act, 23 Pa.C.S §§ 2101-2910.[1] In granting Grandmother's petition, the Orphan's Court denied the Petition to Adopt that the Pre-Adoptive Parents filed.

After thorough review, we vacate the Decree granting Grandmother's adoption petition and remand to the Orphans' Court with instructions to grant the Petition to Adopt that Pre-Adoptive Parents filed. We do so because the Orphan's Court based its Decree solely on the Child's biological connection to Grandmother. The Orphans' Court ignored the undisputed evidence that the Child is traumatized by her visits with Grandmother and Grandmother consistently shows poor judgment when attempting to meet the Child's needs. Moreover, the Child is bonded to, and is thriving in the care of, Pre-Adoptive Parents. The Child, who is four years old, has lived with Pre-Adoptive Parents for most of her life. Therefore, it is in the Child's best interests for Pre-Adoptive Parents to adopt the Child.

---

[1] On December 5, 2015, we denied Pre-Adoptive Parents' motion for consolidation of these appeals. After our substantive review of the parties' briefs and the joint record submitted on appeal, we now *sua sponte* consolidate the Agency's and Pre-Adoptive Parents' appeals in the interests of judicial economy and for ease of disposition.

**Factual and Procedural History**

The Child was born on December 14, 2011. On March 12, 2012, when she was almost three months old, the Lackawanna County Office of Youth and Family Services ("the Agency") removed the Child from her mother because the Child, while in the mother's care, suffered severe chemical burns to her eyes as a result of someone putting an alkaline cleaning product in her eyes. The Child spent two weeks in Wills Eye Hospital. The Child is legally blind and remains medically fragile. She has undergone, and will continue to undergo, multiple eye surgeries for which extensive post-operative care is required, including multiple kinds of eye drops a day and various eye patches.

At the time of the injury, the Child was living with her mother, who was seventeen years old, and Grandmother. Following an investigation by the Agency, the Agency found that the injury was "non-accidental" and "indicated" both the mother and Grandmother as the perpetrators of the child abuse.

On May 12, 2012, the court adjudicated the Child dependent and placed the Child with a family member. The family member, however, found it too stressful to meet the Child's medical needs and deal with the mother. After two months, the family member asked the Agency to remove the Child from her care. The Agency then placed the Child with Pre-Adoptive Parents, who are trained to care for medically fragile children. The Child has remained with Pre-Adoptive Parents for the past three and a half years. Pre-

Adoptive Parents have years of experience fostering medically fragile children and provide consistent and high quality medical care for the Child as well as a loving and caring home.

In 2014, the mother voluntarily relinquished her parental rights to the Child. The court then terminated the parental rights of the Child's father and changed the Child's permanency goal to adoption.

After the court terminated the mother's parental rights, the court ordered the Agency to provide Grandmother with a weekly two-hour, "line-of-sight" supervised visit.[2]

Grandmother appealed her child abuse "indicated" status, and the administrative agency eventually expunged the finding. Consequently, the Agency arranged for the Child to have longer line-of-sight supervised visits with Grandmother.[3] Those visits occurred once a week and lasted four hours each. The Agency never recommended increasing the length of the visits because of the Agency's concerns expressed in visitation reports. N.T. at 98.

_____

[2] "Line-of-sight" visits are the Agency's most restrictive types of visits. They require that someone monitor the visit at all times. **See** Notes of Testimony (N.T.), 8/13/15, at 84-85.

[3] Grandmother also accompanied Pre-Adoptive Parents and the Child to many of the Child's medical appointments and would visit at the Pre-Adoptive home on major holidays.

On March 6, 2015, Pre-Adoptive Parents filed a Report of Intention to Adopt the Child in accordance with 23 Pa.C.S. §§ 2530 and 2531(c), and attached a pre-adoptive investigation and home study. They then filed a Petition for Adoption on April 9, 2015.

On May 5, 2015, the Agency filed a Petition to Intervene, which the Orphans' Court granted. The Orphans' Court also continued an evidentiary hearing on Pre-Adoptive Parents' Adoption Petition, and directed that Grandmother be given notice of the petitions and the new date for the hearing on the Petition for Adoption of May 26, 2015.

On May 21, 2015, Grandmother filed a response to Pre-Adoptive Parents' Adoption Petition, as well a counterclaim Petition for Adoption. The Agency and Pre-Adoptive Parents filed preliminary objections asserting that Grandmother had not properly intervened and had not attached appropriate documentation to her counterclaim adoption petition. The trial court denied the preliminary objections.

On August 13, 2015, the Honorable Thomas Munley held an evidentiary hearing on both Petitions to Adopt. At the hearing, Pre-Adoptive Parents presented the testimony of Pre-Adoptive Mother, as well as that of present and former Agency caseworkers, Sharon Roginski, Stephanie Herne, Jane Leach, and Lisa Gruszewski, who worked closely with the Child and the

parties, and an in-home nurse, Tammy Miller.[4]  Grandmother presented testimony from the relative with whom the Agency had initially placed the Child, as well as her own testimony.

At the end of the hearing, the Child's Guardian *Ad Litem*, Kevin O'Hara, Esq., testified that it was in the Child's best interest to remain in the Pre-Adoptive parents' home. The Orphans' Court requested briefs from the parties, articulating his analysis of this case as between the Pre-Adoptive Parents, to whom the Child is more attached than anybody, and the Grandmother who is a blood relative:

> … [T]he [C]hild has been living with the [Pre-Adoptive Parents] for three years.  And they're doing a great job raising this child. I'm sure at this point the child is more attached to the [Pre-Adoptive Parents] than anybody.  But the point is [Grandmother] is a blood relative.  So, this is what we have to decide, amongst other things.  But that's a major issue here.

N.T. at 238.

On October 14, 2015, the Orphans' Court granted Grandmother's Petition to Adopt and entered a Decree stating that the Orphan's Court "accept[ed] the Petition filed by [Grandmother] in regard to [the Child], and will permit her to schedule an Adoption Hearing within six months of the date of this Decree[.]"  Decree, 10/14/15.  In addition, the court directed the Agency "to facilitate the transition of [the Child] from foster placement

_____

[4] Tammy Miller, R.N., works at the pre-adoptive home 5 days a week, 8 hours a day, to provide care for one of the other medically fragile children in the family.

to placement with [Grandmother] as the child's adoptive resource." ***Id.***

Both Pre-Adoptive Parents[5] and the Agency filed timely appeals. The

Orphans' Court did not require the parties to comply with Pa.R.A.P. 1925(a).

**Issues Raised on Appeal**

Pre-Adoptive Parents raises the following issues:

1. Did the orphans' court err as a matter of law in denying [Pre-Adoptive Parents'] petition for adoption and accepting [Maternal Grandmother's] petition for adoption when the orphans' court did not engage in any analysis of [K.D.'s] best interests, did not consider [her] special medical needs or emotional needs, and issued a decision contrary to the evidence presented and the recommendations of the [A]gency, [K.D.'s] guardian ad litem and [K.D.'s] Court-Appointed Special Advocates?

2. Did the orphans' court err as a matter of law in overemphasizing [Maternal Grandmother's] status as a "blood relative" of [K.D.] by making it the controlling factor in its decision and in minimizing [Pre-Adoptive Parents'] relationship to [K.D.] by treating them as foster parents rather than preadoptive [sic] parents?

3. Did the orphans' court err as a matter of law in allowing [Maternal Grandmother] to participate in adoption proceedings and in accepting [her] petition for adoption over [Pre-Adoptive Parents'] petition for adoption when [Maternal Grandmother] was not granted leave of court to intervene in the adoption proceedings and did not secure the required consent of the [A]gency to her proposed adoption, and accordingly lacked standing to adopt [K.D.]?

---

[5] Although this ruling appears to be interlocutory and the Orphans' Court did not expressly deny Pre-Adoptive Parents' competing adoption petition, we conclude that Pre-Adoptive Parents' appeal is properly before us. ***See Adoption of J.E.F.***, 864 A.2d 1207 (Pa. Super. 1996).

4. Did the orphans' court err as a matter of law in failing to consider whether the statements in [Maternal Grandmother's] petition were true, whether the needs and welfare of [K.D.] will be promoted by [Maternal Grandmother's] adoption, and whether [she] met the requirements of the Adoption Act when Section 2902 of the Adoption Act requires a court to make these findings in permitting an adoption?

Pre-Adoptive Parents' Brief at 4-5.

The Agency raised the following issues:

1. Whether the Orphans' Court erred by allowing [E.D.] to participate in these adoption proceedings without a hearing or an order filed of record allowing intervention, by not dismissing the counter[-]petition [for] adoption, and by dismissing [Maternal Grandmother's] petition for adoption for failure to have the required attachments?

2. Whether the Orphans' Court erred by not performing a best interests of the child analysis and by not determining if the three requirements of 23 Pa.C.S.A. [§] 2902 were met?

3. Whether the Orphans' Court erred by not considering the concerns about [Maternal Grandmother] raised by the Agency and [K.D's court-appointed special advocates] including [Maternal Grandmother's] behavior during visits with [K.D.], difficulty in administering medication during visits, [K.D.'s] behavior following visits, and whether [K.D.] has a bond with [Maternal Grandmother], who has not moved past line of sight supervision?

4. Whether the Orphans' Court erred by concluding that the Agency did not increase visitation when the evidence shows that [K.D.] was dependent and all aspects including visitation were subject to the three months permanency review hearings of the Juvenile Division of the Court of Common Pleas?

5. Whether the Orphans' Court erred by determining that [Maternal Grandmother] as an eligible foster parent was on an "equal footing" to the Pre-Adoptive Parents when

- 8 -

it makes clear that foster parents have a subordinate and temporary status[?]

6. Whether the Orphans' Court erred by stating that but for the indicated status, [Maternal Grandmother] would have been considered for foster care and [K.D.] placed with her when the undisputed evidence is that [Maternal Grandmother's] home would not be approved for placement when [K.D.'s] mother, who was and still is indicated, was a member of the household?

The Agency's Brief at 4-5 (excess capitalization removed).

**Standard of Review**

Our paramount concern in child custody cases is to determine the best interests of the child. *Choplosky v. Choplosky*, 584 A.2d 340, 341 (Pa. Super. 1990); **M.A.T. v. G.S.T.**, 989 A.2d 11, 19 (Pa.Super. 2010). Thus, "our appellate function is to make an independent judgment that, based on the testimony and evidence before us, is in the best interest of the child." **Id.** at 19.[6]

We review a trial court's custody determination for an abuse of discretion. *In re B.L.L.*, 787 A.2d 1007, 1015 (Pa. Super. 2001). An abuse of discretion does not exist merely because a reviewing court would have reached a different conclusion. *In Re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). Appellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows

---

[6] Although **M.A.T** is a custody case, the best interest of the child analysis equally applies in an adoption case.

that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will. *Id.*

This Court has observed that this Court has the broadest discretion in reviewing appeals from Adoption Decrees:

> [A]ppellate review of child custody Orders is of the broadest type, *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992), and we may modify the trial court's custody determination where it is shown by evidence of record to be manifestly unreasonable, *In re: David L.C.*, 376 Pa.Super. 615, 546 A.2d 694 (1988); *see also Robinson v. Robinson*, 538 Pa. 52, 645 A.2d 836 (1994) (appella[te] interference warranted where custody Order is manifestly unreasonable). Further, our review is not bound by the trial court's deductions, inferences and interpretations of evidence and we will exercise independent judgment to consider the merits of the case and to enter an Order that is correct and just. *Bucci v. Bucci*, 351 Pa.Super. 457, 506 A.2d 438 (1986).

*In re Adoption of D.M.H.,* 682 A.2d 315, 318 (Pa. Super. 1996).

The proceedings in an adoption hearing are unique and involve parties, experts, investigators, and non-parties to a greater extent than in custody hearings, but ultimately are subject to the same standard, "that being the best interest of the child." *In re B.L.L.*, 787 A.2d at 1015, *citing In re Adoption of A.S.H.*, 674 A.2d 698 (Pa. Super. 1996).  .

Thus, where the trial court has abused its discretion and the record is sufficiently developed, this Court may, rather than remand the case, "substitute our judgment for that of the trial court and decide the case on the merits." *Wiseman v. Wall*, 718 A.2d 844, 851 n.3 (Pa. Super. 1998). *See also In re Michael T.L. v. Marilyn J.L.*, 525 A.2d 414, 421 (Pa. Super. 1987) (having found that the award of custody to father was

unsupportable by the facts of record, this Court considered the best interests of the child and granted custody to mother); *In re Custody of Temos*, 450 A.2d 111, 119 (Pa. Super. 1982) (reversing trial court order and awarding custody to mother based on facts of record); *McAnallen v. McAnallen*, 446 A.2d 918, 923 (Pa. Super. 1982) (awarding custody to mother where evidence indicated the best interests of the child would be served by awarding custody to mother); *W.C.F. v. M.G.*, 115 A.3d, 323, 331-32 (Pa.Super. 2015) (vacating as unreasonable the trial court's order awarding the mother primary physical custody, and remanding for entry of "an order consistent with the trial court's findings and this Court's decision.").

In this case, the Orphans' Court made a significant error of law and abused its discretion by foregoing a proper and complete analysis of the undisputed evidence regarding the best interests of the Child. The court based its decision solely on the Child's biological connection to Grandmother, rather than a reasoned review of the entire record. Since the record is complete, we reverse the Orphans' Court granting Grandmother's Petition to Adopt and remand for the Orphans' Court to enter an Order granting Pre-Adoptive Parents' Petition to Adopt.

**Legal Analysis**

Pre-Adoptive Parents' third issue and the Agency's first issue challenge the Orphans' Court's consideration of Grandmother's and the Pre-Adoptive Parents' competing adoption petitions. They assert that because the trial

court did not hold a hearing on Grandmother's Petition for Intervention prior to holding a hearing on the adoption petitions, this Court should reverse the trial court's Order. For the following reason, at this juncture of the proceedings, reversal on that basis alone would be inappropriate and not in the interests of judicial economy.

After Pre-Adoptive Parents filed their adoption petition, Grandmother responded with an answer and a counterclaim Petition for Adoption. The Pre-Adoptive Parents and the Agency filed preliminary objections to Grandmother's Counterclaim and Petition for Adoption, arguing that Grandmother was not a party to the proceedings and had not filed a Petition to Intervene. They also challenged the lack of documentation supporting Grandmother's counterclaim petition. Grandmother subsequently filed a Petition to Intervene as well as her own separate Adoption Petition. Although the trial court did not enter an Order that appeared on the lower court's docket permitting Grandmother to intervene, the trial court ultimately stated that it had granted Grandmother's request to intervene. **See** Orphans' Court Decision and Decree, 10/14/15, at 2, citing **In re Adoption of Hess**, 608 A.2d 10 (Pa. 1992).

Although the lower court's docket is devoid of an explicit written Order granting Grandmother's Petition to Intervene, we conclude that because Grandmother filed a separate Petition for Adoption, the trial court's consideration in one proceeding of all of the parties' requests for relief was

proper. *See In re J.E.F.*, 902 A.2d 402 (Pa. 2006) (concluding that a single proceeding is the most expeditious way to address competing adoption petitions). To do anything else at this point of the proceedings would elevate form over substance and serve only to delay further the Child's adoption. Accordingly, we review the remaining issues in the interests of judicial economy.

We will now address the Agency's and Pre-Adoptive Parents' remaining issues together because they each pertain to the failure of the trial court to analyze the Petitions for Adoption according to well-established law.

Both Pennsylvania's Adoption Act and case law require the court deciding a Petition for Adoption to base its decision on the "physical, mental, and emotional needs and welfare of the child." 23 Pa.C.S. § 2724(b); *In Re: Adoption of A.S.H.*, *supra* at 700. In other words, the court must make its decision on a case-by-case basis after consideration of "all factors that bear on the child's physical, emotional, intellectual, moral and spiritual well-being," and the "best interest of the child." *Id*.; *In Re B.L.L.*, 787 A.2d at 1015. *See also In re: Adoption of Hess*, 562 A.2d 1375, 1378 (Pa.Super. 1989) (observing that adoptees "have the right to have their 'best interests' determined upon a consideration of all relevant facts.").

We are mindful that, when possible, the preservation of the family is the desired outcome in custody matters. However, "[t]he goal of preserving the family unit cannot be elevated above all other factors when considering

the best interests of the children, but must be weighed in conjunction with other factors." *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa. Super. 2011) (citation omitted).

Additionally, the Orphans' Court has the duty to consider the statements and opinions of the Guardian *Ad Litem* when making its determination of which family would better serve the bests interests of the child. *Adoption of D.M.H.*, 682 A.2d 315, 322 (Pa. Super 1996).

In this case, the Orphans' Court focused only on Grandmother's interests as a "blood relative," and the purported inaction of the Agency to facilitate increased contact between the Grandmother and Child.[7] *See* Decision and Decree at 9-10. In doing so, the court ignored much unrebutted evidence that established that it was not in the Child's best interest to grant Grandmother's Petition for Adoption. That evidence includes the following:

**Child's Negative Reaction to Visiting with Grandmother**

_____

[7] The Orphans' Court relies upon *In the Interest of Tremayne Quame Idress R*., 429 A.2d 40, 44 (Pa. Super. 1981), to support its legal conclusion of the primacy of blood relationship in determining the best interest of a child. This Court in that case discusses the importance of the biological relationship for a child. However, after doing a best interest analysis, we held that the trial court properly granted custody to the foster parent and not to the grandmother.

The trial court, without any factual basis, concludes that the Child's visits with Grandmother "are reported to be enjoyable for all involved, and have occurred without incident." Decision and Decree at 2. Although the Child has shown no disruptive behavior during her visits with Grandmother, the trial court's conclusion is contrary to the overwhelming evidence, and ignores the testimony from numerous witnesses that the Child is traumatized by her visits with Grandmother.

The undisputed evidence at trial indicated that **both** before and after visits with Grandmother, the Child has tantrums, becomes uncharacteristically aggressive, is unable to sleep, and periodically will urinate and defecate on herself. *See* N.T. at 101-02, 110, 119-121, 150-151, 153, 177, 179-80. Even when the Child speaks to Grandmother on the telephone, the Child becomes aggressive after the phone call. N.T. at 153. It generally takes a few days for the Child's behavior to settle down after these visits. N.T. at 111, 119, 151, 153, 182.

In contrast, during the weeks that the Child does not visit with the Grandmother, the Child is pleasant and easy-going. *Id*. at 111, 153.

**Grandmother's Inability to Provide Basic Medical Care and Address the Child's Other Needs at Visits.**

The Agency worker testified that Grandmother had not been able to provide basic care to the Child's eyes during the visits without reminders and assistance from the Agency supervisor. *See* N.T. at 71-72. On one occasion, Grandmother took off the Child's eye patch to take a photo of the Child,

placed the eye patch on the floor, and almost placed the contaminated eye patch back on the Child's eye. N.T. at 90-91.

The unrebutted testimony also established that Grandmother lacked good judgment when engaging in activities with the Child. For instance, Grandmother wanted to paint the Child's fingernails. This was a concern because there was a risk that, because the Child rubs her eyes frequently, the nail polish could get into the Child's eyes and cause additional damage. (N.T. at 74, 82 158-159). In fact, the Grandmother did put glitter nail polish on the Child's nails at one visit and some of the glitter ended up in one of the Child's eyes.

Additionally, the activities that Grandmother engages in with the Child are, at times, for the benefit only of Grandmother and not the Child. For instance, Grandmother would bring her dogs to her visits even though Grandmother knows that the Child is afraid of dogs. N.T. at 101, 104-05. When the Agency supervisor discussed this concern with Grandmother, Grandmother told the supervisor that the Child would have to get used to the dogs because the dogs are part of Grandmother's life. N.T. at 101. Grandmother ultimately stopped bringing the dogs to the visits.

Grandmother would also bring clothes to the visits for the Child, change the Child into those clothes, even though the Child had no interest in constantly changing her clothes, and change her back to her original clothes at the end of the visit.  N.T. at 71.

Grandmother would discuss inappropriate matters with the Child, such as the Child's biological mother, Grandmother's desire to have unsupervised visits, or the status of the court proceedings. N.T. at 72, 93. As a result of Grandmother's inappropriate activities, the caseworkers had to coach Grandmother on appropriate conduct at visits with a three-year-old child and the manner in which Grandmother should appropriately play and talk with the Child. N.T. at 71-73.

**Supervised Visits**

Additionally, the Orphans' Court faults the Agency for the Grandmother's failure to be granted more than one, four-hour visit per week with the Child. However, as discussed below, the Grandmother's inappropriate behavior during supervised visits and the Child's trauma after the visits was the reason for Grandmother not progressing to additional contact with the Child. *See* N.T. at 98. The Agency is responsible to the Child when making recommendations about visitation and given Grandmother's inappropriate behavior during visits and the Child's negative response to the visits, the Agency properly limited Grandmother's supervised visits. To blame the Agency for the limits on Grandmother's visits, instead of Grandmother's conduct during the visits, ignores much of the evidence that the parties presented at the hearing.

**Grandmother's Self-Centered View of
Her Role in the Child's Life**

The trial court also failed to consider the Grandmother's self-centered view of her role in the Child's life. When Grandmother's attorney asked her the reasons that it is in the Child's best interest to adopt the Child, Grandmother's response was not about her desire to meet the Child's needs, but about Grandmother being a good person and falling in love with the Child when the Child was in utero:

> I love my granddaughter with all my heart. I didn't do anything wrong. I would never, ever do anything wrong. I am a good person. I've always done right. Right from the get-go, right from school, after school. I've done nothing but good things. I've never been in any kind of trouble. I have gone to all of her doctor's appointment. I have fallen in love with her while she was still in my daughter's stomach. I saw all of the ultrasounds. I heard the heartbeats. One ultrasound stood out. It was like a child pressed up against the screen door with the nose pressed in. And my daughter's great big fat cheeks. I just so fell in love with my granddaughter.

N.T. p. 203.

Although it is important that adoptive parents love the adopted children, it is also important that an adoptive parent understand the daily work and challenges in providing stability, security and safety for a child, especially a medically fragile child. In this case, Grandmother loved the theory of having a child to love, but lacked the understanding of the daily and never ending commitment to meet the needs of the Child.

Moreover, Grandmother did not offer any evidence that it would be in the Child's best interests to be with her. She did not rebut the overwhelming evidence presented that the Child was thriving with the Pre-

Adoptive Parents. She did not rebut the evidence of the Child's pre- and post-visit behavior from which it is reasonable to infer that the visits negatively affected the Child's normally pleasant disposition. Although Grandmother's attorney suggested in cross-examining one of the Pre-Adoptive Parents witnesses that it was not just before and after Grandmother's visits that the Child acted out, Grandmother did not rebut the testimony provided by multiple witnesses that the Child displayed signs of stress and aggression before and after visits with Grandmother, and those behaviors would subside until the next visit or contact. Most significantly, there was no evidence presented to counter the overwhelming evidence that the Child has a meaningful, stable, and loving bond with her Pre-Adoptive family with whom she has lived nearly her entire life. *See* N.T. at 18, 49, 91, 113, 131, 159. *See In the Interest of Tremayne Quame Idress R*., 429 A.2d 40, 44 (Pa. Super. 1981) (holding that "where the custody dispute is between two third parties, one who is a relative but not a parent and one who is not a relative, the burden of proof should be allocated equally between the parties.").

### Grandmother's Difficulties Raising Her Own Child

The trial court also ignored that Grandmother had difficulties raising her daughter, the biological mother of the Child. The Agency had to remove the daughter from the care of the Grandmother for a year. N.T. at 235. Although this factor is not dispositive in determining whether an adoptive parent can adopt, it is a factor that the trial court failed to consider.

**Pre-Adoptive Parents Close Relationship with the Child**

In contrast to Grandmother, when asked if it would be in the Child's best interest to remain with the Pre-Adoptive Parents, the Pre-Adoptive Mother's testimony was not about herself, but about the impact removing the Child would have on the Child:

> Because she is stable. She's has a mom and she has a dad. Which is very important in a girl's life. She's been there since almost day one. I know she was only 6-months old, but she knows her territory. [The Child] still has trouble seeing. I've watched that little girl crawling on the floor and bumping into cupboards. She's come a long ways. We have worked very hard to get [the Child] where she is. And I feel like to take her away from us now, [Grandmother] may get what she wants, but in the end she won't want what she has. Because it's going to be devastating. And it's going to do a very, very bad damage to [the Child.]

N.T.161.

The testimony presented at trial established that the Child has a meaningful and loving bond with her pre-adoptive family that has provided her with a safe and nurturing home. *See* N.T. at 13, 89, 131, 148, 150-152, 159, 161-62. The Child stays physically close to the Pre-Adoptive Parents, hugging them, laughing and interacting with them. N.T. at 90, 112, 152. She calls her Pre-Adoptive Parents "mom" or "mommy," and "dad." N.T. at 73, 152. This is not surprising because the Pre-Adoptive Parents have not only provided the Child with safety, security and stability for the past three years (nearly all her life), but have gone to great lengths to ensure that she receives quality medical care for her eyes.

Pre-Adoptive Parents have taken her to and cared for her after seven eye operations, and arranged for her to participate in blind therapy and then vision therapy. They purchased a Nook for her to help her eyes to focus and they, along with other caregivers in the house, do books, puzzles and other activities with her to help her focus her eyes. N.T. 149-50. In addition, the Child receives homeschooling from a teacher who comes to the house each day. N.T. at 167.

Under the care of Pre-Adoptive Parents, the Child has gone from a six month old who was unable to see to a happy, well-adjusted, vibrant, precocious, smart, and funny four year old. N.T. at 109, 112, 161.

Significantly, the trial court essentially dismissed the substantial bond between the Child and the Pre-Adoptive Parents with whom the Child has lived for all but the first six months of her life. In fact, in dismissing the relevance of the testimony that the Child has a meaningful and loving bond with the Pre-Adoptive Parents, the trial court actually faults the Pre-Adoptive Parents for developing a bond with the Child. ***See*** Decision and Decree at 8.

**Recommendation from the Guardian Ad Litem and CASA workers**

The trial court also, without any explanation and contrary to its obligation, ignored the recommendations of the Guardian *Ad Litem* and the CASA worker who worked closely with the Child, that it should be the Pre-Adoptive Parents who adopt the Child. ***See*** N.T. at 18, 54, 239. ***Adoption of D.M.H.***, 682 A.2d at 322.

- 21 -

**Conclusion**

Based upon the undisputed testimony and the complete record, we reverse the Orphans' Court grant of the Grandmother's Petition to Adopt and order that the Orphans' Court grant the Pre-Adoptive Parents Petition to Adopt.

Order vacated. Case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/22/2016