J-A02039-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: E.M.G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.G. | |
| | No. 2524 EDA 2016 |

Appeal from the Order Entered July 7, 2016
in the Court of Common Pleas of Philadelphia County Family Court
at No(s): CP-51-AP-0000216-2014

BEFORE: OTT, RANSOM, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MARCH 23, 2017**

A.G. ("Aunt") appeals from the order entered in the Court of Common Pleas of Philadelphia County, which granted the petition to adopt E.M.G. ("Child"), that Child's former foster parents, M.M. and Y.M. ("Foster Parents") filed pursuant to the Adoption Act, 23 Pa.C.S. §§ 2101-2910. When granting Foster Parents' adoption petition, the trial court also denied Aunt's petition to adopt the Child. We affirm.

The trial court made the following findings of fact:

> 1. On July 16, 2013, [Child] was removed from the home of her biological parents, following the fatality of her older half-sister, and allegations of child abuse against [Child's] biological father.

---

[*] Former Justice specially assigned to the Superior Court.

2. An aggravated circumstances hearing was held on July 29, 2013, and on October 29, 2013[,] there was a finding of aggravated circumstances.

3. On July 30, 2013, after a hearing on the merits, [Child] was adjudicated dependent by the court.

4. On September 9, 2014, the parental rights of [Child's] biological parents were terminated.

5. Upon removal from the biological parents' home, [Child] was placed in a treatment foster home through Lutheran Children and Family Services.

6. On July 7, 2015, Aunt[1] filed a petition to adopt [Child], and on August 25, 2015, Foster Parents filed a cross-petition to adopt.

7. Foster Parents' Petition to Adopt is supported by the Child Advocate.

8. [The Department of Human Services ("DHS")] approved the family profile for Foster Parents on May 14, 2015.

9. Ms. Tracey Thomasey, Social Worker from the Support Center for Child Advocates, testified that [Child] is very bonded to the Foster Parents. Ms. Thomasey testified that [Child] has a very strong parent-child relationship with [Foster Parents]. Ms. Thomasey further testified that disruption of this relationship would be traumatic to [Child].

10. [Foster Parents] have provided a stable home for [] Child supported by extended family and a network of friends.

11. [Child] has developed a sibling relationship with [Foster Parents'] young son.

12. The trial court accords significant weight to the testimony offered by Ms. [Elizabeth] Hogan, Ms. [Sandra

---

[1] Aunt is Child's paternal aunt.

- 2 -

Lee] Starkes and Ms. [Tracy] Thomasey. All of which the court found to be credible, reliable, and reflective of superior professional competency.[2]

Trial Ct. Op., 9/19/16, at 4-5 (citations omitted).

Aunt testified at trial, stating that she had been in Child's life since her birth and continuously and actively pursued adoption of her niece. N.T. 1/13/16, at 36-40. Aunt did admit to a nine-month period, right after Child was placed in foster care, during which she had no contact with Child. *Id.* at 76. Aunt highlighted that after she was granted supervised visitation with Child, she traveled bi-monthly, at her own expense, from her home in Atlanta, Georgia, to visit with Child. *Id.* at 70. In addition, Aunt described her close relationship with several other of Child's blood relatives. *Id.* at 18. Aunt also provided pictures of a bedroom she had prepared in her home for Child. *Id.* at 20.

Aunt discussed her diverse home community in Atlanta, Georgia and her intention to provide Child with many intellectually enriching experiences. *Id.* at 32-34. Aunt reported that she is employed as a database administrator and applications specialist and has an option to work from

---

[2] Ms. Starkes, a Lutheran Children and Family Services Social Worker, testified that as the on-going case-manager for Child, she had observed Child with Foster Parents bi-monthly for approximately two years. N.T. 1/13/16, at 150-51. She testified that Child had a positive "huge turnaround" with Foster Parents and had "blossomed [into] this beautiful little girl." *Id.* at 156. Although she also observed Aunt's visits with Child and had "no concerns" about Aunt, Ms. Starkes specifically noted the close bond between Child and Foster Parents. *Id.* at 153-55.

home. *Id.* at 26-27. During her testimony, Aunt also expressed her trepidation that if allowed to adopt Child, Foster Parents would not include her in Child's life, while she intended to include Foster Parents if she were permitted to adopt. *Id.* at 47-50. Aunt also opined that removing Child from the parents she has known for the majority of her life would not be damaging for Child at three-years-old. *Id.* at 46.

While DHS acknowledged that Aunt was persistent in her bid to adopt Child, the agency declined to oppose the adoption petition of either Aunt or Foster Parents. *Id.* at 175. DHS presented the testimony of Heather Coles who reported that Aunt was considered an adoptive resource "based on her commitment; her coming to visits twice a month" and "based on family connections." *Id.* at 174. However, Ms. Coles admitted that she did not meet Child, or observe Child interact with Aunt or Foster Parents. *Id.* at 175. At trial, it was noted that the interstate compact unit at DHS had approved Aunt's home study necessary for adoption. *Id.* at 189-90.

Ultimately, on July 7, 2016, the trial court issued an order granting Foster Parents' adoption petition and denying Aunt's petition. Aunt filed a timely notice of appeal and simultaneously filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(1). The trial court filed a responsive opinion.

Aunt raises the following issues for review:

> I. Whether the trial court erred in failing to conduct a thorough examination of the child's best interests when it

considered only the evidence offered by or on behalf of the [Foster Parents], failed to acknowledge or give any weight to the evidence presented by or on behalf of Aunt, and failed to conduct a comparative analysis of the relative benefits of the two prospective adoptive families?

II.  Whether the court erred in failing to consider persuasive evidence supporting a conclusion that [Child's] best interests would be served by allowing Aunt to adopt the Child when the court ignored her consistent contact with the Child since birth and the emotional bond between them, her timely and persistent attempts to be considered an adoptive resource, and the administrative and litigation delays that prevented her from being able to perform parental duties on behalf of the child prior to trial?

III. Whether the court erred in failing to acknowledge or give weight to [DHS's] support for Aunt's adoption of the Child, where it is the public policy of this Commonwealth to prefer placement with a relative and to prefer family reunification, where the Foster Parents intend to sever all ties for the Child with her biological family, and where there was no evidence presented disputing that Aunt is capable of undertaking the parental role?

Aunt's Brief at 14-15.

The crux of all three of Aunt's issues lies in her overarching contention that the trial court failed to consider vital aspects of the evidence presented while engaging in an analysis of Child's best interests. Therefore, we will discuss all three issues in tandem. Aunt specifically contends that the trial court did not sufficiently consider her persistent and significant efforts to adopt niece, which were delayed only by events outside of Aunt's control, such as administrative and litigation delays. *Id.* at 37-38. She points to her continual involvement in Child's life and her emotional bond with Child. *Id.* She also cites her own ability to provide a "permanent, healthy and safe

environment" for Child. *Id.* at 30-31. Moreover, Aunt emphasizes her status as a blood relative of Child and asserts that allowing Foster Parents to adopt Child would effectively cut Child off from her biological family, thus failing to promote Pennsylvania's public policy of the preservation of family ties. *Id.* at 43-45. We conclude that no relief is due.

We begin by noting our standard of review:

> It is of course true that our paramount concern in child custody cases is to determine the best interests of the child. Thus, appellate review of child custody [o]rders is of the broadest type, and we may modify the trial court's custody determination where it is shown by evidence of record to be manifestly unreasonable. Further, our review is not bound by the trial court's deductions, inferences and interpretations of evidence and we will exercise independent judgment to consider the merits of the case and to enter an [o]rder that is correct and just.
>
> * * *
>
> Despite this Court's broad standard of review regarding child custody orders, on issues of credibility and weight of the evidence, we must defer to the findings of the trial judge who has had the opportunity to observe the proceedings and the demeanor of the witnesses.

*In re Adoption of D.M.H.*, 682 A.2d 315, 318 (Pa. Super. 1996) (citations omitted).

Regarding petitions for adoption, this Court has recently set forth the following legal precepts:

> Both Pennsylvania's Adoption Act and case law require the court deciding a Petition for Adoption to base its decision on the "physical, mental, and emotional needs and welfare of the child." 23 Pa.C.S. § 2724(b). In other words, the court must make its decision on a case-by-case

- 6 -

> basis after consideration of all factors that bear on the child's physical, emotional, intellectual, moral and spiritual well-being and the best interests of the child.
>
> We are mindful that, when possible, the preservation of the family is the desired outcome in custody matters. However, the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors.

*In re K.D.*, 144 A.3d 145, 152-53 (Pa. Super. 2016) (some citations and quotation marks omitted) (holding that trial court erred by granting biological grandmother's petition to adopt minor child where child was thriving with unrelated pre-adoptive parents).

Further, it is well settled that "once the parental rights have been terminated, anyone may become an adoptive parent[.]" *D.M.H.*, 682 A.2d at 319 (citations omitted). Significantly, when parental rights have been terminated "the familial relationship, the blood connection, no longer has the significance that it would have otherwise." *Id.* We also recognize that when considering the impact of familial relationships, "a live-in relationship with a direct sibling is far more powerful than occasional or even regular visits with cousins or other similarly distant family members." *Id.* at 320.

Moreover, it is beyond cavil that when both parties are equally fit:

> and the child is of tender years, the trial court must give positive consideration to the parent who has been the primary caretaker. Not to do so ignores the benefits likely to flow to the child from maintaining day to day contact with the parent on whom the child has depended for satisfying his basic physical and psychological needs.

> The removal of a young child from an established home with one parent has long been recognized as a factor which bears upon his emotional well-being. A child becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it.

*Commonwealth v. ex rel Jordan*, 448 A.2d 1113, 1115 (Pa. Super. 1982) (quotation marks, citations and footnotes omitted).

In the case *sub judice,* Aunt's argument that her status as a blood relative should have been determinative is unavailing. As our case law demonstrates, a biological connection is but one factor for consideration and does not retain the same significance once parental rights have been terminated. **See K.D.**, 144 A.3d at 152-53; **D.M.H.**, 682 A.2d at 319 (affirming biologically unrelated adoptive parents' right to adopt minor child over maternal grandmother). In addition, the trial court properly considered Child's relationship with her Foster Parents' son, with whom Child has lived for the majority of her life and with whom she enjoys a close sibling relationship. **See id.** We conclude that the trial court did not commit error by declining to find that Aunt's biological connection to Child was alone sufficient to require Aunt's adoption petition to prevail.

Further, the trial court was well within its purview when finding that the testimony presented regarding Child's bond with Foster Parents was persuasive and ultimately dispositive. **See D.M.H.**, 682 A.2d at 318 ("on issues of credibility and weight of the evidence, we must defer to the findings of the trial judge who has had the opportunity to observe the

proceedings and the demeanor of the witnesses"); *Jordan*, 448 A.2d at 1115 ("the trial court must give positive consideration to the parent who has been the primary caretaker"). While Aunt's arguments regarding her considerable efforts toward adopting Child are significant and laudable, the trial court appropriately focused on Child's bests interests when fashioning its decision to allow Foster Parents, the only parents Child has known for the majority of her life, to adopt Child. *See D.M.H.*, 682 A.2d at 318 (paramount concern should be given to the best interests of the child). The trial court aptly concluded:

> The court considered any and all contact that Aunt had with [Child] and gave it the appropriate weight. Any attempts by [Aunt], no matter how well intentioned, [were] no substitute for the continuity of care required by a child during the crucial formative years. This continuity of care was afforded [Child] by Foster Parents.

Trial Ct. Op., at 7.

We discern no abuse of discretion and see no reason to disturb the trial court's decision to grant Foster Parents' petition to adopt Child. Accordingly, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/23/2017