J-S22019-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.J.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: W.A., GRANDFATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 4100 EDA 2017 |

Appeal from the Order Entered November 9, 2017
In the Court of Common Pleas of Wayne County
Civil Division at No:  No. 2016-00003,
No. 2017-00007, No. 2017-00009

BEFORE:  BENDER, P.J.E., STABILE, J., and PLATT, J.[*]

MEMORANDUM BY STABILE, J.:                **FILED JULY 09, 2018**

Appellant, W.A. ("Maternal Grandfather"), appeals from the order entered on November 9, 2017, in the Court of Common Pleas of Wayne County, which granted the petition to adopt his then seven-year-old grandson, A.J.A. ("Child"), that Appellees, R.M. ("Foster Father") and B.H. ("Foster Mother") (collectively, "Foster Parents"), filed pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2101-2910, and scheduled an adoption hearing, *inter alia*.  In

_____

* Retired Senior Judge assigned to the Superior Court.

granting Foster Parents' petition, the court denied the petition to adopt that Maternal Grandfather filed.[1] Upon careful review, we affirm.

The factual and procedural history relevant to this appeal are as follows. In January 2014, Wayne County Children & Youth Services ("CYS") received a request to visit Child at the home of Maternal Grandfather.[2] At the time of its visit, Maternal Grandfather was not present, and CYS found Child in the care of his maternal aunt, who appeared impaired.[3] N.T., 9/29/17, at 9. On January 17, 2014, the court placed Child in the protective custody of CYS, which then placed Child with Foster Parents. *Id.* at 10. The court adjudicated Child dependent on February 19, 2014. *Id.* at 9. The court involuntarily terminated the parental rights of Child's mother, K.A. ("Mother"), by decree entered on July 15, 2016, and of Child's father, M.S. ("Father"), by decree

_____

[1] In addition, the order denied the petition for adoption filed by S.G. ("Paternal Aunt"). Paternal Aunt did not file a notice of appeal, and she is not a party to this appeal.

[2] CYS received the request from a child welfare agency in New Jersey, which had been involved with the family. N.T., 9/29/17, at 9.

[3] Ms. Bass testified that CYS received an allegation that Child's maternal aunt was under the influence of crack. N.T., 9/29/17, at 9. The record does not reveal whether she was tested for drugs on the date of Child's placement.

entered on August 9, 2016.[4, 5]  The record reveals that Mother had a significant history of substance abuse and did not satisfy her permanency plan goals.  *Id.* at 98.

Foster Parents filed a report of intention to adopt Child on January 9, 2017, which they amended on January 23, 2017.  They filed a petition for adoption on March 1, 2017.  On May 11, 2017, CYS filed a consent to adoption of Child by Foster Parents.  Maternal Grandfather filed a petition to intervene on February 28, 2017, and he filed a petition for adoption on March 8, 2017.  Finally, on March 29, 2017, Paternal Aunt filed a petition to intervene, a report of intention to adopt, and a petition for adoption.  Paternal Aunt subsequently filed a motion to consolidate the competing adoption petitions to determine which party's petition would move forward, which the trial court granted by order dated April 12, 2017.[6]

---

[4] The Honorable Raymond L. Hamill, P.J., presided over the termination proceedings, and he presided over the subject adoption proceedings.

[5] Mother filed a notice of appeal, and this Court affirmed the involuntary termination decree.  *See In re A.A.*, 160 A.3d 253 (Pa. Super. 2017) (unpublished memorandum).  Father did not appeal from the termination decree.

[6] The trial court bifurcated the matter into two separate evidentiary hearings because it was "expeditious, as opposed to hosting multiple hearings on each petition prior to scheduling the final adoption hearing."  Trial Court Opinion, 1/5/18, at 2-3.  In doing so, the court explained that it relied on *In re K.D.*, 144 A.3d 145 (Pa. Super. 2016), wherein we approved of addressing competing adoption petitions in a single proceeding.  *See In re K.D.*, *supra* at 152 (citing *In re J.E.F.*, 902 A.2d 402 (Pa. 2006) ("concluding that a single

The hearing on the competing petitions occurred September 29, 2017. CYS presented the testimony of its assistant director, Amy Bass; Foster Mother; and Foster Father. Maternal Grandfather and Paternal Aunt testified on their own behalf. Legal counsel and a guardian *ad litem* ("GAL") represented Child during the hearing, both of whom argued in support of Foster Parents' petition to adopt.[7]

On October 11, 2017, the trial court issued a decree granting Foster Parents' petition for adoption and denying the remaining parties' petitions. Further, the order directed that Child "shall have all the rights of a child and heir of [Foster Parents] and they shall be subject to all the duties of such child." Decree, 10/11/17.

On October 20, 2017, Foster Parents filed a motion for reconsideration asserting, in essence, that the decree finalized the adoption prematurely.[8] Foster Parents requested the court vacate the decree and issue a new order

_____

proceeding is the most expeditious way to address competing adoption petitions")).

[7] Likewise, Child's counsel and GAL filed appellee briefs to this Court in support of the subject order.

[8] Specifically, Foster Parents averred that testimony was not presented necessary to finalize the adoption such as "the presentation of a home study or criminal background as required." Motion, 10/20/17, at ¶ 9. Further, they averred that discussions have been ongoing with Maternal Grandfather and Paternal Aunt "regarding an Act 101 Agreement. It is necessary that any Act 101 Agreement reached be incorporated into the Adoption proceedings." *Id.* at ¶ 10.

"which simply reiterates the fact that the court will be moving forward on the Adoption Petition filed by [Foster Parents]." Motion, 10/20/17, at ¶ 11. Foster Parents further asserted that counsel for CYS and for Child, as well as the GAL, were in agreement with the request. *Id.* at ¶ 12-14.

By order dated and entered on November 9, 2017, the trial court vacated the October 11, 2017 decree. The order scheduled a hearing on the Foster Parents' petition for adoption for purposes of finalizing the adoption. The order expressly denied the petitions for adoption filed by Maternal Grandfather and Paternal Aunt. Maternal Grandfather timely filed a notice of appeal along with a concise statement of errors complained of on appeal.[9] On January 5, 2018, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a).

On appeal, Maternal Grandfather raises the following issue for our review:

> 1. Did the trial court err or abuse its discretion in denying Appellant an adoption hearing where Appellant had a long-standing relationship with [Child] from [Child's] birth, where [Child] remembered Appellant and expressed a desire to have an ongoing relationship with Appellant, where Appellant diligently pursued and acquired both kinship care certification and foster care certification while [Child] was a dependent child for the sole

_____

[9] We must determine *sua sponte* whether an appeal is taken from an appealable order. *See Gunn v. Automobile Ins. Co. of Hartford, Connecticut*, 971 A.2d 505, 508 (Pa. Super. 2009). "An appeal lies only from a final order, unless permitted by rule or statute." *Stewart v. Foxworth*, 65 A.3d 468, 471 (Pa. Super. 2013). Instantly, we deem this order final and appealable. *See In re K.D.*, *supra* (determining that order granting the grandmother's petition to adopt and permitting her to schedule an adoption hearing within six months of the date of the order was final and appealable) (citing *In re Adoption of J.E.F.*, 864 A.2d 1207 (Pa. Super. 2004)).

purpose of becoming a placement resource for [Child], where [CYS] offered no evidence that Appellant was an improper placement resource, and where the delay of Appellant's approval for both kinship care and foster care was due to the actions of [CYS][?]

Maternal Grandfather's brief at 6 (unnecessary capitalization omitted).

This Court reviews an adoption determination for an abuse of discretion. *In re K.D.*, *supra* at 151. We will not conclude that there is an abuse of discretion "merely because a reviewing court would have reached a different conclusion." *Id.* (citation omitted). Rather, "[a]ppellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *Id.* (citation omitted).

We have stated, "[i]n both custody and adoption matters, our paramount concern is the best interests of the child. This 'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being." *In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa. Super. 1996) (citations omitted); *see also* 23 Pa.C.S. § 2902(a).

When this Court reviews a trial court's "best interests" analysis in custody and adoption matters, our scope of review is as follows:

> An appellate court is not bound by findings of fact made by the trial court which are unsupported in the record, nor is it bound by the court's inferences drawn from the facts. However, on issues of credibility and weight of the evidence, an appellate court defers

to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. Only where it finds that the custody order is manifestly unreasonable as shown by the evidence of record will an appellate court interfere with the trial court's determination.

*A.S.H., supra* at 700 (citations and internal quotation marks omitted).

Maternal Grandfather first argues on appeal that the trial court abused its discretion in denying his petition for adoption because CYS had approved him as a kinship and/or foster care resource three years in a row. We conclude that this argument is without merit because, despite being approved as a foster care resource, the record reveals that CYS determined it was not in Child's best interest to place him in kinship care with Maternal Grandfather.

Amy Bass, the CYS assistant director, testified that CYS approved Maternal Grandfather as a kinship/foster care resource on June 24, 2015, at which time Child had been in placement for eighteen months. N.T., 9/29/17, at 19. However, CYS did not transfer custody of Child to him because, approximately three months earlier, in March of 2015, the court directed CYS to provide reasonable efforts to reunify Child with Father, and Maternal Grandfather did not support the court-ordered reunification efforts. *Id.* at 19-21. Ms. Bass explained that a foster care resource needs to "fully support" a child's placement goal. *Id.* at 21. She testified that, in contrast to Maternal Grandfather, the Foster Parents did support the reunification effort with Father. *Id.* at 22.

In addition, Ms. Bass testified that CYS did not place Child in kinship care with Maternal Grandfather because Maternal Grandfather "had a very close relationship with [Mother]. However, one of our concerns from the very beginning of the case and continuing still to today is that his very close bond and love for his daughter clouds his judgment such that we have concerns about his protective capacities and his tendency to enable both of his daughters, the one from which [sic] [Child] was placed . . . and [Mother]." *Id.* Ms. Bass acknowledged on cross-examination that CYS's primary concern regarding Maternal Grandfather is that he has "denial issues with regard to family members and drug abuse."[10] *Id.* at 46. On direct examination, she further explained:

> Q: So when looking at an identified kinship resource, are all of these factors something that the agency considers in analyzing the best interest of the child?
>
> A: Yes. We have to know wherever that child is placed that they are aligned with the child, aligned with the agency, able to protect, able to whistle blow, able to identify problems and bring them

---

[10] Maternal Grandfather testified on direct examination:

> Q. [T]here's been some discussion about [Child's maternal aunt] having an issue with drug use?
>
> A. I don't know anything about that. I know she's on a lot of prescriptions.

*Id.* at 90. With respect to Mother, Maternal Grandfather acknowledged that he supported her reunification with Child in the underlying dependency matter. *Id.* at 98. He testified, "after a while I found out that [Mother] had drug abuse." *Id.* at 91.

forth, and we continue to have reservations as to [Maternal Grandfather]'s capacity to do that.

*Id.* at 22. Further, despite rejecting Maternal Grandfather as a kinship care resource for Child, Ms. Bass testified CYS approved him three years in a row as a foster care/kinship resource because "[h]e continued to ask to be approved and he met the requirements." *Id.* at 47. Based on the foregoing, Maternal Grandfather's assertion that the trial court abused its discretion in denying his petition for adoption because CYS approved him as a foster care resource for three consecutive years is without merit.

Maternal Grandfather next argues that the trial court abused its discretion because "Child has a long-standing close relationship and there is no dispute that Child and Grandfather share a bond and love that remains steadfast." Maternal Grandfather's brief at 13. We discern no abuse of discretion.

There is no dispute in the record that Child has a bond with Maternal Grandfather. During 2014, after CYS removed Child from Maternal Grandfather and placed him with Foster Parents, Maternal Grandfather participated in regular visits with Child on an alternating weekly basis, and those visits went "very well." N.T., 9/29/17, at 18. Foster Mother testified that, in between visits, Child "spoke of [Maternal Grandfather] often," who he refers to as "Pop Pop." *Id.* at 69. The court suspended Maternal Grandfather's visits, as well as Mother's visits, in July of 2015, after Child began visiting with Father and developed behavioral problems. *Id.* at 26-27. Child's counselors

supported eliminating "as many variables as possible to determine what was contributing to this behavior. . . ." *Id.* at 26. Foster Mother testified that Child expressed missing Maternal Grandfather and wanting to see him after the visits ceased.[11] *Id.* at 82. She testified that she "absolutely" would support an appropriate relationship between Child and Maternal Grandfather. *Id.* at 82-83.

Likewise, CYS supports an appropriate relationship between Child and Maternal Grandfather. Ms. Bass testified on cross-examination:

> Q. So the concerns you have don't necessarily, wouldn't necessarily [a]ffect your opinion on whether or not [Child] should see his grandfather on some kind of regular basis?
>
> A. The concern that I would have would be whether that contact was unsupervised and the decisions he would make to allow [maternal aunt] or [Mother] to also have access. Other than that, [Maternal Grandfather] is very appropriate with [Child] and I believe that [Child] would benefit greatly from continuing contact with his grandfather.

*Id.* at 46-47.

Despite the indisputable bond Child has with Maternal Grandfather, the record reveals that Child's parental bond is with Foster Parents. Foster Mother testified that, for almost two years, Child refers to her and her husband as "mom and dad." *Id.* at 76. Foster Parents have adopted five other children ranging in ages from twenty to five, and Child refers to them as his siblings. *Id.* at 67, 76. Foster Father's testimony was consistent with that of Foster

---

[11] The record does not reveal if and when the court reinitiated Maternal Grandfather's visits with Child.

Mother. *Id.* at 86. In response to a question on direct examination regarding whether Child "has formed a significant and positive bond with [his] family," Foster Father testified, "Yes. This is home to him." *Id.* at 87. Foster Mother testified that, if removed from their home, "it would impact [Child] in a very traumatic way and I don't think he can handle it." *Id.* at 76. Based on the foregoing, we conclude there is no merit to Maternal Grandfather's argument that the court abused its discretion because of the bond that exists between him and Child.

To the extent that the court granted Foster Parents' adoption petition because Child has been in their care throughout this case, Maternal Grandfather argues, "Placement of Child with Foster [P]arents, rather than [with him], was the decision of [CYS] who were the sole cause of delays in investigating Grandfather's alleged criminal and abuse history. [CYS] had an affirmative obligation to properly consider Grandfather [with] due diligence rather than cause the very delays [CYS] then used against Grandfather as a reason to deny placement." Maternal Grandfather's brief at 13-14. This assertion is likewise without merit.

Ms. Bass testified that Maternal Grandfather wanted to be a resource for Child since the time of his placement and adjudication in 2014. N.T., 9/29/17, at 16. With respect to the reason for the eighteen-month delay in approving him as a foster care resource, she testified that CYS had difficulty obtaining records from its sister agency in New Jersey, which was involved with the family first. She testified as follows.

We had information from New Jersey that [Maternal Grandfather] had a history both criminally and with our counterpart, the Children and Youth Agency in New Jersey. . . . So throughout most of 2014, we struggled to be able to obtain records from our sister agency from New Jersey to preliminarily screen whether those records would eliminate him as a foster parent not.

*Id.* Specifically, Ms. Bass acknowledged on redirect examination that the New Jersey agency told CYS that Maternal Grandfather's criminal charge related to "possession of marijuana and conspiracy." *Id.* at 64. In fact, she testified that, on January 21, 2014, soon after Child's placement, Maternal Grandfather tested positive for marijuana. *Id.* at 65. Further, Ms. Bass testified, "there were several times . . . between January and June of 2014[,] that [Maternal Grandfather] was asked to screen [for drugs] and he told us that he was unable to."[12] *Id.* In addition, she testified that the New Jersey agency told CYS, "that he had a child-abuse record with them."[13] *Id.* at 64. Further, the sister agency told CYS "that they would never support Child going to his care." *Id.*

Ms. Bass testified that CYS "never fully and thoroughly received [the records] so finally," on a date she did not specify in her testimony, CYS

---

[12] On cross-examination by Maternal Grandfather's counsel, Ms. Bass testified that CYS ultimately learned that the criminal charge was from 1993, and that it had been dismissed. N.T., 9/29/17, at 42.

[13] Ms. Bass testified that the child abuse allegations arose in 1986 and 2004, and they involved Maternal Grandfather and Mother. She testified that the allegations were determined to be unfounded. *Id.* at 44.

requested that a "home study" be conducted for the purpose of foster care approval, "with the understanding that there may be automatic disqualifying factors that we just have not been able to obtain yet." *Id.* at 17-18. She testified that, once Maternal Grandfather "successfully completed his home study process with [CYS]," he received the certificate of approval as a foster care resource. *Id.* at 19. Thus, the record demonstrates that CYS acted reasonably during 2014 in requesting and waiting for the records involving Maternal Grandfather from its sister agency in New Jersey. CYS then acted reasonably in requesting the home study after the delay in obtaining the records.

Moreover, even if the eighteen-month delay in approval had not occurred, there is nothing in the record to indicate that CYS would have made Maternal Grandfather the kinship care provider of Child. As discussed above, the evidence reveals it was not the delay in the approval process, but his failure to support the court-ordered reunification efforts with Father, his close relationship with Mother, and his denial during the underlying dependency matter of her drug issues, that CYS based its decision not to make Maternal Grandfather the kinship care provider of Child. Therefore, we reject Maternal Grandfather's argument.

Upon review, the testimonial evidence supports the order granting the adoption petition filed by Foster Parents and denying Maternal Grandfather's petition. Child was four years old when placed with Foster Parents. Foster

Mother testified he "didn't know his ABC's. He didn't know any songs. He didn't know his numbers. He didn't know his colors and we were battling a lot of medical issues. He had 8 cavities upon entrance in care. He also had lesions all over his body, rashes, breathing issues." N.T., 9/29/17, at 68. She testified that Child presently does "extremely well" in school, and he has no delays in any of his school subjects. *Id.* at 77, 79. She indicated he is "advanced" in his school subjects. *Id.* at 79. With respect to his physical health, she testified he is doing "very well." *Id.* at 77. Finally, Foster Mother testified that Child continues to receive counseling services, and his behavioral issues "have substantially improved." *Id.* at 74. Based on the totality of the evidence, we conclude that the November 9, 2017 order is reasonable. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/9/18