J-A11003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| R.R.B. | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| S.A.M. | : | |
| | : | |
| Appellant | : | No. 1929 MDA 2018 |

Appeal from the Order Entered October 26, 2018
In the Court of Common Pleas of Lebanon County Civil Division at No(s):
2016-20539

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 18, 2019**

S.A.M. ("Mother") appeals from the order entered on October 26, 2018, awarding her sole legal custody and primary physical custody of her son, C.B. Mother challenges aspects of the custody order relating to how R.R.B. ("Father") can exercise the narrow periods of physical custody that the court awarded to him.  We affirm.

C.B. was born during October 2010.  The parties never married, and the relationship dissolved prior to the birth of C.B.  For the first eight years of the child's life, Mother maintained primary physical custody of C.B., most recently in Palmyra, Lebanon County, Pennsylvania, and Father exercised rare periods of overnight custody at his home in Ashland, Pennsylvania, approximately sixty miles away from Palmyra.  Father asserted that his lack of contact with C.B. was due, in part, to Mother's interference.

On January 4, 2018, Father filed a custody complaint seeking shared physical and legal custody. Following a conciliation conference, Mother's filing of exceptions to the conference officer's recommended interim order, and the trial court's unsuccessful attempts to broker a consent agreement, the court conducted a two day custody trial. At the close of the evidence, the trial court issued its decision from the bench and delineated its rationale on the record in open court pursuant to Pa.C.S. § 5323(d). Stated plainly, the court concluded that Mother overscheduled C.B.'s activities in an attempt to minimize Father's contact with his son, and announced that it was not going to require Father to forgo control over his custodial periods in order to travel with C.B. from Ashland to Palmyra for activities that interfered with his custody. Accordingly, the trial court awarded Mother legal custody and primary physical custody of C.B during approximately eighty-six percent of the time, and Father was granted limited periods of physical custody on alternating weekends and two nonconsecutive weeks during summer vacation. In addition, as it relates to the arguments raised in this appeal, the custody order memorialized the court's perspective that Father retains discretion to choose which of C.B.'s activities to attend during his custodial periods.

The following paragraph embodies the trial court's view of Father's discretion.

> All Custody Orders are modifiable and reviewable. The one we entered on October 26, 2018 should be given a chance to work. If FATHER wields his limited alternating weekend custody control

to hurt C.B. simply because he can, such conduct will not be viewed positively by this Court. If MOTHER reaches out to attempt collaboration and FATHER obstinately rebuffs her outreach, we will not be pleased. If these things occur, we will not foreclose the possibility of modifying the Order we have entered today. However, we will not PRESUME today that minimal cooperation between the parties is an impossible goal.

Trial Court Opinion, 12/6/18, at 17-18.

Mother filed a timely notice of appeal and complied with Pa.R.A.P. 1925(a)(2)(i) by contemporaneously filing a concise statement of errors complained of on appeal raising six issues, which she reiterates for our review as follows:

a.      Whether the trial court committed error and abused its discretion in ordering Mother to be entitled to select only two weeks for summer camps as the limitation upon opportunities for child care arrangements during the school recess is not in the best interests of the child?

b.      Whether the trial court committed error and abused its discretion in ordering that [Father] not be required to inform Mother of his vacation preference until the 15 of May as the limitation upon opportunities for child care arrangements during the school recess is not in the best interests of the child?

c.      Whether the trial court committed error and abused its discretion in its grant of alternate weekends as the minimum in an award of partial physical custody rather than any lesser amount as dictated by the evidence presented?

d.      Whether the trial court committed error and abused its discretion by subordinating the child's best interests to the rights of the Father as it permits Father to remove from, rather than join with, the child in established patterns and activities that have fostered the child's physical, intellectual, moral, spiritual and emotional well being?

e.      Whether the trial court committed error and abused its discretion in failing to recognize Father's repeated acquiescence of custody as an example of unfitness?

f.      Whether the trial court committed error and abused its discretion by not basing its conclusion of Mother limiting Father's relationship with the minor child on competent evidence, yet relying on said conclusion in the formation of the custody order?

Mother's brief at 12-13 (unnecessary capitalization omitted).

We review Mother's issues according to the following scope and standard of review:

> This Court reviews a custody determination for an abuse of discretion. *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016). We will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." *Id.* (citation omitted). Rather, "[a]ppellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *Id*.

*R.L. v. M.A.*, 2019 PA Super 145, 2019 WL 1967809 (filed May 3, 2019).

> Moreover,
>
> on issues of credibility and weight of the evidence, we defer to the findings of the trial [court] wh[ich] has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa.Super. 2014) (citations omitted).

After a thorough review of the certified record, the parties' briefs and the pertinent law, we discern no abuse of discretion on the part of the trial court as to the issues raised by Mother, and we affirm the custody order on the basis of the cogent and well-reasoned opinion that Honorable Bradford H. Charles entered on December 6, 2018.[1]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/18/2019

---

[1] Mother asserts that the trial court order precludes her from registering C.B. in summer camp, which she uses as childcare during the summer. Her complaint is misguided. We observe that Mother can continue to rely upon summer camp for childcare, she simply cannot dictate Father's vacation schedule beyond the two-week period she is entitled to reserve for summer camp in her initial notification to Father regarding C.B.'s summer activities. Thus, to the extent that the trial court neglected to clarify this point in its opinion, no relief is due.

IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY
PENNSYLVANIA

CIVL ACTION – LAW

R.     R. B.              ,                    : NO. 2016-20539
                Plaintiff                     :
                                              :
        v.                                    :
                                              :
S.      A. M.       ,                         :
                Defendant/Appellant  :


APPEARANCES:

Max Smith, Esquire,                  For R.        D. B.

Kim Lengert, Esquire                 For S,      A. M.


OPINION BY CHARLES, J., December 6, 2018

On October 24, 2018, this Court conducted a Custody Trial in the above-referenced matter. Following the trial, we awarded sole legal custody and primary physical custody of the parties' son C.B. to S.   A. M.   (hereafter MOTHER). We afforded R.     R, B,         (hereafter FATHER) with only 14% of the available physical custody time. By any definition, MOTHER was the successful litigant in the Custody Trial. Nevertheless, she has filed an Appeal because we did not give her everything that she wanted. To say that we are disappointed with MOTHER's Appeal would be an understatement. We issue this Opinion in support of our decision.

## I. FACTS

MOTHER and FATHER are the parents of 8 year old C.B.[1] At all times pertinent hereto, MOTHER has resided in Palmyra of Lebanon County. FATHER has resided in Ashland, Schuylkill County. The two parents are separated by a drive time of between 60 and 75 minutes

MOTHER and FATHER separated approximately three months before C.B. was born. For several years thereafter, FATHER did not play an important role in C.B.'s life. In fact, before filing the Custody Action now before this Court, FATHER had enjoyed only one or two periods of overnight custody with his son. FATHER explained: "She would not let me have him."

On January 4, 2018, FATHER filed a Complaint for Custody. The parties met with a Custody Conciliator, who recommended that the parties share legal custody and that FATHER should enjoy physical custody on alternating weekends. MOTHER filed exceptions to this recommendation. This Court conducted an initial Pre-Trial Conference on June 15, 2018. At that time, we documented that MOTHER and FATHER had agreed to a custody schedule that afforded FATHER with alternating weekends of physical custody. We also documented that a dispute existed with respect to whether FATHER should be required to drive C.B. back to Lebanon County for all of his activities. We stated in our Pre-Trial Order:

> "MOTHER and FATHER reside in different counties. MOTHER is a resident of Palmyra, Lebanon County. FATHER resides in Ashville, Schuylkill County. The

---

[1] For the sake of C.B's privacy, we will refer to him only by his initials.

2

drive distance between the parents is approximately 1 hour. This creates problems with respect to the child's sports activities. This Court would expect FATHER to transport his son to any scheduled games that may be scheduled in Lebanon County. However, FATHER should not be required to transport his son to all practices that may occur during his weekend. Of course, both parents should consult with their son's coaches when making a decision about practices and games." (¶ E of Court Order dated June 15, 2018.)

We ultimately declined to schedule an immediate Custody Trial; we stated "This Court perceives that MOTHER and FATHER are close to having an agreement."

Our hopes that an agreement would be entered were quashed relatively quickly. On July 2, 2018, MOTHER filed a Motion seeking to proceed with a Custody Trial. We scheduled another Pre-Trial Conference for July 20, 2018. After the second Pre-Trial Conference, a Custody Trial was scheduled for October 24, 2018.

At the Custody Trial, we heard testimony about both parties and C.B. Both parties complained that the other wanted undue control over matters relating to custody. FATHER sought a shared custody arrangement. MOTHER wanted to remain in control of all matters pertaining to C.B.

A primary point of contention was C.B.'s extracurricular activities. We learned that C.B. was active in church, sports and scouting. MOTHER wanted C.B. to attend all of his activities, even during weekends when C.B. would be with his father. FATHER took the position that he should

3

not be required to drive to Lebanon on each of his weekends for C.B.'s various activities.

Following trial, this jurist rendered a decision in Open Court. We articulated our analysis of the factors set forth in Pennsylvania's Custody Act. This jurist also articulated the following regarding C.B's activities:

- "Ma'am, it seems to me that you have worked very hard to limit Dad's contact with [C.B.]. You have all but said that Boy Scouts, hikes, camp, soccer, time with grandparents, all of those things are more important than C.B. spending time with his father, and you are dead wrong on that. Dead wrong." (Custody Decision N.T. 3)

- "There is no evidence that either of you have affirmatively acted to turn [C.B.] against the other parent, but there is evident information that both of you would do that if you had the chance. And I think subtly Mom has done that by prioritizing all of these other things over Dad's limited contact with the child. And I'm going to repeat what I said before, Ma'am. Right now under the existing Court Order you have 86% of time and he has 14% of time. That speaks for itself. That is about as limited a contact as a father should ever have, and you want to limit it even further." (Custody Decision N.T. 6)

- "Education is important, but under today's day and age positive developmental activities are, I won't say just as important, but, boy, it comes really, really close. Idle hands truly are the Devil's

4

workshop. When I was presiding in Juvenile Court for kids that committed crimes, almost inevitably those kids when I asked them well, do you play sports, are you in the band, do you have any activities that you enjoy, almost none of them did. Almost none of them did and so they had idle time and they gravitated toward things they shouldn't do. The kids who succeed in this world are kids who are active, are kids who play sports, who are in the band or are in drama, who have a purpose in their lives and they have goals. Positive activities teach teamwork. They teach social skills. They teach the ethic that practice and work leads to improvement. They teach delayed gratification. Positive activities afford kids with purpose. It's something they look forward to. It introduces kids to other children who have a purpose, other children who are self-disciplined, other children who will help them in a positive direction. Positive activities surround children with adults who are volunteers and coaches who can turn out to be mentors. I cannot underestimate the value of positive activities for a child. They are important." (Custody Decision N.T. 7)

- "I think right now you [the parents] need help getting along....In part because of your [MOTHER's] unwillingness to give him credit for what he has attempted to do and your unwillingness to consider the fact that he can be a positive influence on your son, more positive

5

than soccer or Boy Scouts or something along those lines." (Custody Decision N.T. 8)

- "I need to talk about activities. This is a common issue. I have already acknowledged their importance. I believe in positive activities for children. I believe in keeping children active. I believe in giving them goals and giving them a purpose. I already said all of that. But I need to be clear, Dad's time is Dad's time and if he doesn't want to travel to Palmyra for an activity, that's his choice, not yours. [MOTHER's]. If there is a conflict between one of [C.B's] activities and Dad's time, Dad makes the decision of whether [C.B] comes to the activity or [C.B] stays in Ashland. It's his choice.

  Now with that being said, I hope that you [FATHER] make the choice to consider keeping [C.B] involved in his activities even on your weekend. Maybe not, you know, two or three different times each and every weekend, but if he has an important activity, not a practice, he can miss practices we all know that, but if he has an important soccer game or he has the Pinewood Derby, which is an important activity for Cub Scouts or Boy Scouts, if it's an important activity - - and you're going to know which ones those are - - I hope you make the choice to drive down with him and be with him for that activity.

  I was a Little League baseball coach for many years and I faced this issue. We had many kids on our team whose parents had

6

split. One weekend they're with Dad, one weekend they're with Mom, and the one parent usually would have the kid at the game or practices each and every weekend they had custody, the other weekend it was not so consistent, and that was normal. That was something that we as coaches had to learn to deal with. But here was the problem: We would have a playoff game on Saturday and Johnny wouldn't show up because Johnny was with his dad and his dad just didn't support baseball and Dad lived, you know, a mile or two miles away or whatever, but Johnny wouldn't show up for the playoff game because Johnny was with his dad. The other kids resented Johnny because he was an important part of the team. They needed him, they wanted him there, and when he didn't show up they couldn't take it out on some Judge, they couldn't take it on his dad, they took it out on him. And then in turn Johnny realized that he had let his friends down, he had let his team down, and he started resenting his dad for not letting him participate in that playoff game. I saw that dynamic multiple times in the years I was a coach and it never ended well.

I also saw situation where parents would sit down with me as the coach and say, look, we are going to Cape May that particular weekend for a weekend away with family and Johnny is not going to be at the baseball game that weekend. We have explained it to Johnny that we're going to Cape May and we wanted to talk to you

so that you could understand. Then I would also talk to Johnny and I would talk to the rest of the team and I would say, Johnny is not going to be here next week because he has a trip planned with his family that's important and he needs to be with his family, so we're going to have to play all that much harder to make up for Johnny's absence, and it worked seamlessly and there was no resentment.

I am putting you [FATHER] in control of what you do on your weekends, but I implore you to consider [C.B's] activities and how important they are to him. I do not expect that you would bring [C.B.] down to Palmyra as much as she [MOTHER] would like you to bring him down to Palmyra. I don't expect that. If you have a soccer game in the afternoon and a Boy Scout activity at night I don't expect him to be at both. And I expect that there will be weekends when you want to go camping or hiking or shooting or whatever and that you're simply going to prioritize you own activities over his commitments in Palmyra. I expect that as well. All I am saying is that I ask you to talk with your son, communicate with his coaches, with his leaders, his adult leaders, and to come to the conclusion that this is something he can miss and this is something that he really shouldn't miss, and for those activities that he really shouldn't miss I implore you to take the time to drive down with him so that you can participate in those activities with him. It will go so much better.

8

The other thing I'm going to say about activities is that they can be some of the most meaningful child-parent time. I look back on my own children's lives and the things I remember are the Little League baseball games, the softball games, the swim meets, the concerts, the plays, and watching the joy in their face when they achieved something that they really weren't sure they were going to be able to achieve and having them run up to you and hug you when they're done because they are so happy with what they accomplished, what their hard work has accomplished. Those are some of the best memories I have as a parent and I want that for both of you. I want that for you, sir. I want you to be a part of that. Don't deprive yourself of those moments.

All that being said, ma'am, I'm going to reiterate one more time, less there be no confusion, his time is his time and [Father] makes the decision, not you." (Custody Decision N.T 12-16)

Much to our surprise, we received an Appeal of our decision from MOTHER on November 20, 2018. In her Appeal, MOTHER complained that we afforded FATHER with alternating weekends "rather than any lesser amount as dictated by the evidence presented." She also complained that we provided FATHER with the discretion to choose whether or not to drive C.B. to Palmyra for all of his weekend activities. She also complained about the portion of our Court Order that afforded

9

FATHER with two non-consecutive weeks of physical custody for purposes of vacation. We author this Opinion in support of the Custody Decision we reached on October 26, 2018.

## II.  DISCUSSION

### A. Alternating Weekend Schedule

We begin our analysis by recognizing that MOTHER has been the primary parental influence upon C.B. for his entire life. We have no qualms about the historic care provided by MOTHER for C.B, nor do we quarrel with the vast majority of decisions that MOTHER has rendered with respect to her son. In almost every way, S₂. A. M. has been a quintessential "good mom".

The primary problem we have with MOTHER is that she is seeking to prevent FATHER from becoming a "good dad". Without question, FATHER did not play a significant role in his son's life for most of his pre-school years. However, he has expressed a clear desire to become an active father, and he has backed up his stated desire with his actions. Over the past several years, FATHER has seen his son frequently. For much of this time, he has enjoyed alternating weekend physical custody. By all accounts, FATHER has developed a good relationship with C.B. We have heard nothing about abuse, neglect or emotional trauma arising from FATHER's time with C.B.

10

The Custody Order we entered afforded FATHER with custody approximately 14% of C.B.'s available time. That left MOTHER in control of C.B. approximately 86% of the time. By any definition, we afforded MOTHER with an overwhelming award of primary physical custody. Yet she complains that we did not limit FATHER even further.

This Court views alternating weekends as a minimal period of physical custody. We also remember that as recently as June, MOTHER had agreed to an alternating weekend physical custody paradigm. (See, Pre-Trial Conference Order of June 15, 2018). Quite frankly, we have a difficult time understanding why MOTHER now takes the position that FATHER's time with his son should be reduced below what we had ordered.

We fully understand that MOTHER has military commitments that require her to be absent from home one weekend per month. We addressed this dynamic by stating:

> "Here is what should happen regarding physical custody: You folks should sit down with a calendar, you should look at Mom's drill schedule, you should look at [C.B's] activity schedule, you should look at plans that Dad has for activities that he wants to do with [C.B.] and then the two of you should figure out, ok, these two weekends this month are Dad's, these two weekends this month are Mom's. They·may not perfectly mesh, but it's better than doing it any other way. It's more convenient. It's less impactful in terms of [C.B.'s] activities. That's what you should do. Each and every month figure out in advance with all of your schedules which two weekends a month are Dad's and which two weekends a month are Mom's. That's what should happen, and I have built room into the Court Order if you want to do that. But if you don't then we're going to go with the alternating weekend

> physical custody schedule, ma'am, which I consider to be an absolute minimum." (Custody Decision N.T. 11)

Unfortunately, it appears as though MOTHER is not even wiling to attempt collaboration with FATHER regarding the weekend schedule. Her Appeal papers suggest that she simply wants FATHER's time reduced.

It is the opinion of this Court that FATHER should have two weekends per month with his son. It would be best for all concerned if MOTHER and FATHER could sit down on a month-to-month basis and arrange the best weekends for this to occur. If they cannot, then the easiest and most stable schedule to enforce is an alternate weekend schedule. Like millions of other parents who live within this paradigm, these parties will have to learn how to arrange their own schedules to accommodate and facilitate the physical custody time awarded to the other parent. We will not relieve MOTHER of having to undertake this sometimes hard and uncomfortable work.

We stand by our decision to award FATHER with alternating weekend physical custody. MOTHER has presented no reason why this minimal period of physical custody awarded to FATHER should not be continued.

B. Summer Vacation

Our Court Order awarded FATHER two non-consecutive weeks during the summer for a vacation with C.B. At the Custody Trial, MOTHER expressed concern about C.B's summer camp commitments. Because of this, we built in the following language in our Court Order:

12

"On or before May 1 of each year, MOTHER is to notify FATHER of summer camp commitments for [C.B.]. MOTHER shall be entitled to select two weeks for summer camps. FATHER shall not be entitled to select one of the camp weeks for his vacation. On or before May 15 of each year, FATHER shall notify MOTHER of the weeks during which he wishes to exercise vacation physical custody during the summer."

MOTHER objects to the award of week-long vacation periods of physical custody. She claims that she should be entitled to select more than two weeks for C.B's summer camps. She also argues that the May 15 date we selected was an abuse of discretion "as the limitation upon opportunities for child care arrangements during the school recess is not in the best interest of the child."[2]

Vacation time is an important way for a parent to build memories with a child. As people grow into adulthood, they look back upon their childhood years and remember trips that they took with their parents; it is much more rare for adults to remember routine daily events they engaged in at home as children. It is the belief of this Court that both parents should be afforded the opportunity to enjoy vacation time with C.B. As primary custodian, MOTHER will have a multitude of dates to select from in terms of scheduling a vacation. We want to also afford FATHER with a meaningful opportunity to enjoy uninterrupted quality vacation time with C.B. Quite frankly, we do not understand MOTHER's objection to this portion of our Court Order, and we believe it should be affirmed as is.

---

[2] We are not exactly clear as to what MOTHER is trying to convey by this language.

## C. Activities

The issue of activities for C.B. is far and away the most contentious in this case. MOTHER seems to want to prioritize C.B.'s activities schedule over all else...including FATHER's time with his son. MOTHER has involved C.B. in a multitude of positive activities. We do not quarrel with any of these activities, as each will benefit C.B. However, MOTHER has programmed C.B. to the point where it will be impossible to find weekends where FATHER's custody time will not conflict with one of C.B.'s activity commitments. This is a problem.

If FATHER and MOTHER lived in close geographic proximity, this issue would not have been nearly as contentious. Unfortunately, at least one hour of driving time separates each parent. Thus, ensuring that C.B. would attend all of his activities during FATHER's weekends would require two hours of drive time in addition to the time encompassed by the activity itself. When C.B. has more than one activity scheduled in a given weekend – and we understand this occurs frequently – an Order requiring that FATHER transport C.B. to all of his activities would require C.B. to be inside a vehicle for a considerable percentage of FATHER's weekend time. This is neither practical nor in C.B's best interest.

FATHER should be permitted to develop his own activity bond with C.B. He should not be required to spend hours of his weekend physical custody time in a motor vehicle. As a governing paradigm, a non-custodial parent's physical custody time belongs to that non-custodial

14

parent...and not to the custodial parent by virtue of activities that he/she schedules for the child.

With the above having been said, this Court has always recognized the importance of positive extracurricular activities for children. Because we clearly perceived that FATHER does not share this view, we spent an extraordinary amount of time in our Custody Decision to encourage FATHER's involvement in C.B's activities. Using the language quoted on pages 12-16 herein, we implored FATHER to communicate with leaders who are supervising C.B's activities. We encouraged FATHER to prioritize his own presence whenever C.B. has a particularly important game or activity. However, we could not place MOTHER in control of determining whether or when FATHER should be required to drive C.B. from Schuylkill County to Lebanon County; to do this would be to effectively place MOTHER in control of FATHER's physical custody time with his son.

As it relates to extracurricular activities, this Court recognizes that there are no easy solutions. Compromise and communication are essential. We stated in our Court Order:

> "[C.B.] is involved in numerous school-related and extracurricular activities. Both parents shall be entitled to attend and/or participate in such activities regardless of whether the activities occur during a time when the other parent has primary physical custody. Both parents are encouraged to prioritize [C.B.'s] involvement in positive activities. However, the existence of an activity will not supersede FATHER's ability to enjoy physical custody on alternating weekends. Thus, if FATHER has plans for a particular weekend that would conflict with

15

one of [C.B.'s] activities, is shall not be necessary for FATHER to cancel his plans. This paragraph will require both MOTHER and FATHER to communicate with coaches, educators, group leaders, etc. If either parent has plans that conflict with a scheduled activity for [C.B.], it shall be the responsibility of that parent to communicate with adult leaders in charge of hosting/facilitating the activity. Under no circumstances should FATHER be expected to travel to Palmyra for one of [C.B.'s] activities more than once during each period of his physical custody."

We chose this language carefully. It was not our intent to tie either parent's hands as it related to activities; we instead wanted to promote flexibility and communication. We even placed the onus on FATHER to communicate with coaches and adult leaders whenever he chose to prioritize his own activities in Schuylkill County over [C.B's] activities in Palmyra.

We are puzzled by MOTHER's complaints about our language and our Court Order. MOTHER should realize that there is no practical way to specifically craft a Court Order that addresses all extracurricular activities that occur during the non-custodial parent's physical custody time. We have made it clear to both MOTHER and FATHER that this jurist prioritizes extracurricular activities.[3] We believe that FATHER should be given the chance to spend meaningful time with his son, and we hope and expect that he will come to recognize that some of the most "meaningful" moments of a child's life will occur when he is enjoying positive purpose-

---

[3] If in the future we learn that FATHER steadfastly refuses to permit C.B. to attend any activity during his physical custody time, we will be more inclined to issue directives designed to promote C.B.'s continued involvement in his activities.

16

driven activities. It is the belief of this Court that the existing Custody Order should be given a chance to work and that changing it via an Appeal would not be in C.B's interest.

## III. CONCLUSION

We were surprised when we received MOTHER's Appeal papers. We were puzzled when we read her Statement of Errors Complained of on Appeal. As we digested what MOTHER presented, we came to realize that she is uncomfortable ceding any control over her son to FATHER. Her Appeal issues are designed to create a custody paradigm where MOTHER, and MOTHER alone, exercises complete control over all aspects of C.B's life. Our fear is that if MOTHER gets what she wants, the ultimate result will be complete estrangement between FATHER and his son. If nothing else, we can definitively state that estrangement from his father would not be in C.B's best interest.

MOTHER and FATHER do not get along. That much is obvious. The Court Order we entered encouraged the type of communication and collaboration that will not be easy for either party. So be it. Both MOTHER and FATHER have to draw upon their love of C.B. and elevate that over their mistrust and dislike for one another.

All Custody Orders are modifiable and reviewable. The one we entered on October 26, 2018 should be given a chance to work. If FATHER wields his limited alternating weekend custody control to hurt

17

C.B. simply because he can, such conduct will not be viewed positively by this Court. If MOTHER reaches out to attempt collaboration and FATHER obstinately rebuffs her outreach, we will not be pleased. If these things occur, we will not foreclose the possibility of modifying the Order we have entered today. However, we will not PRESUME today that minimal cooperation between the parties is an impossible goal.

Both parties should have to undertake the difficult work of working together and compromising so that each enjoys a healthy relationship with C.B. As C.B. grows older, he will need both a mother and a father. The Court Order we entered on October 26, 2018 was designed to facilitate this goal. The relief MOTHER seeks would make life easier for her because it would effectively place her in complete control. However, it would not facilitate the long-term goal of enabling C.B. to bond with and have an appropriate relationship with his father. It is for this reason that we ask the Pennsylvania Superior Court to affirm the Order that we entered.