J-A22001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: ADOPTION OF: E.M.K. | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 327 WDA 2022 |

Appeal from the Order Entered February 7, 2022
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 44 of 2021

BEFORE:   OLSON, J., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED: OCTOBER 24, 2022**

Appellant, E.B. ("Maternal Grandmother"), appeals from an order entered on February 7, 2022 in the Court of Common Pleas of Westmoreland County that denied her petition to adopt her then three-year-old granddaughter, E.M.K. ("Child").  In denying Maternal Grandmother's petition, the trial court allowed the final adoption hearing on a competing petition filed by B.S. and M.S. ("Foster Parents") to proceed.  Upon careful review, we affirm.

The factual and procedural histories relevant to this appeal are as follows.  Child was born in February 2019.  In October 2019, the Westmoreland County Children's Bureau ("WCCB") obtained custody of Child,

_____

[*] Retired Senior Judge assigned to the Superior Court.

who was diagnosed with failure to thrive and hospitalized due to lack of weight gain. N.T., 12/9/21, at 127. Upon discharge, Child was placed in the home of Foster Parents. *Id.* at 128, 202. The trial court adjudicated Child dependent on January 29, 2020. *Id.* at 127. Child has remained in the care of Foster Parents. *Id.* at 128.

After obtaining custody of Child, WCCB conducted a family finding. *Id.* at 131. On November 20, 2019, WCCB sent a letter to Maternal Grandmother, who resided in North Carolina. *Id.* at 131-132. One week later, Maternal Grandmother asked to be considered as a placement option for Child. *Id.* at 131-132.

Maternal Grandmother and her husband, K.B., adopted Child's biological mother, B.B. ("Mother"), when Mother was five years old. N.T., 2/1/22, at 73, 89, 92. Maternal Grandmother and K.B. also adopted Mother's two siblings, one of whom was a "failure to thrive baby." *Id.* at 4, 8-9. Maternal Grandmother had a foster care license in North Carolina for two years and previously served as a foster parent in New Mexico for approximately seven years. *Id.* at 5-6. Maternal Grandmother served as a foster parent to approximately twenty children, and she previously received trauma-based training as a therapeutic foster parent. *Id.* at 6-7.

Mother reported to WCCB caseworker, Danae Hudock, that K.B. sexually abused Mother. N.T., 12/9/21, at 137. Mother alleged that Maternal Grandmother knew about the incident but did nothing about it. *Id.* Ms.

Hudock is unaware of any criminal investigations in the matter. *Id.* at 161. Mother informed Ms. Hudock that she did not want Maternal Grandmother to be considered as a placement option for Child and that Maternal Grandmother never met Child before Child came into WCCB custody. *Id.* at 137.

On December 10, 2019, WCCB responded to Maternal Grandmother's request to be considered a placement option, explaining that Child's parents, who were living in Pennsylvania, did not want Child placed out-of-state as it would interfere with reunification services. *Id.* at 132. Further, WCCB explained that Child's parents did not wish for Maternal Grandmother to be considered a placement option regardless of her state of residence. *Id.*

Upon receiving a request for an Interstate Compact of Placement of Children ("ICPC") referral from Maternal Grandmother's attorney, WCCB completed an ICPC referral for Maternal Grandmother on May 13, 2020. *Id.* at 132-133. On April 15, 2021, Maternal Grandmother's home was approved for foster home placement, and the approval was valid for six months. *Id.* at 135-136.

Beginning in November 2020, WCCB offered Maternal Grandmother monthly supervised therapeutic visits at the office of King and Associates in Pennsylvania. *Id.* at 4-5, 13, 138-140; N.T., 2/1/22, at 23; WCCB Exhibit 1. Maternal Grandmother attended two in-person supervised visits with Child in November 2020. WCCB Exhibit 1, Monthly Report November 2020, at 2. From December 2020 through February 2021, Maternal Grandmother was

offered and participated in one supervised virtual visit per month. N.T., 12/9/21, at 18, 22, 24; WCCB Exhibit 1, Monthly Reports December 2020 – February 2021. Each virtual visit with Child lasted approximately twenty minutes. N.T., 12/9/21, at 26. From March 2021 through December 2021, Maternal Grandmother was offered and attended supervised in-person visits, once per month, for three hours. *Id.* at 26-27, 30, 38, 43, 46, 49, 52, 55-57; N.T., 1/21/22, at 47; WCCB Exhibit 1, Monthly Reports March 2021 – October 2021; WCCB Exhibit 7, Monthly Report December 2021.

In April 2021, WCCB filed a petition to confirm Mother's consent to voluntarily terminate her parental rights to Child. Simultaneously, WCCB filed petitions to involuntarily terminate the parental rights of Child's legal father, C.K., and any unknown father. The trial court voluntarily terminated the parental rights of Mother by order dated July 28, 2021, and entered on August 3, 2021. The trial court involuntarily terminated the parental rights of C.K. and any unknown father by order dated July 28, 2021, and entered on August 3, 2021. Foster Parents filed a report of intention to adopt and a petition for adoption of Child on August 31, 2021. On October 20, 2021, Maternal Grandmother filed a petition for adoption of Child.[1]

---

[1] On May 6, 2021, Maternal Grandmother filed a complaint for custody. N.T., 12/9/21, at 139. In September 2021, WCCB filed a motion to stay custody proceedings. In an order dated September 23, 2021, the trial court stayed

The trial court held hearings on the competing adoption petitions across three days, on December 9, 2021, January 21, 2022, and February 1, 2022, when Child was two years old. WCCB presented the testimony of: Laiken Eckenrod, a trauma mental health therapist and visitation supervisor at King and Associates; Heather Ratica, director of Child's former daycare center; Danae Hudock, a WCCB caseworker; Judy Marino, Foster Parents' neighbor; Foster Mother; Foster Father; Dr. Neil Rosenblum, managing partner of Allegheny Forensic Associates; and Deanna Pulice, a visitation specialist at King and Associates. Maternal Grandmother testified on her own behalf. The guardian *ad litem* ("GAL") represented Child during the hearings and argued in support of Foster Parents' petition to adopt.

At the December 9, 2021 hearing, Foster Mother testified that she picked Child up from the hospital when Child was only eight months old. N.T., 12/9/21, at 201-202. When Child was placed with Foster Parents, Child had low birth weight and suffered from issues with vomiting and feeding. *Id.* at 202. Foster Mother testified Child "would often throw up following feedings" and "has issues with texture." *Id.* Foster Mother explained that until recently, Child still needed food to be served in smaller portions and that Child "sometimes has issues with different textures even now." *Id.* Foster Mother

---

the custody matter and directed Maternal Grandmother to file a petition for adoption. Trial Court Order, 9/23/21, at 1.

testified that she took Child to see a nutritionist and dietician. *Id.* The recommended diet for Child consisted of very low sugar, high calorie foods. *Id.* Foster Parents fed Child using a special formula for some time, and later transitioned to an organic formula. *Id.* Foster Mother testified that Child remains on a special diet due to her early deprivation. *Id.* at 205.

Foster Mother testified that Child had a genetics appointment in April 2021. *Id.* at 203. Child underwent blood work, and the results revealed an elevated calcium level and "an issue with one of [Child's] thyroid blood tests." *Id.* Child was recommended to undergo further testing with an endocrinologist. *Id.* Child continues to receive regular routine medical care. *Id.* at 204. Foster Parents also took Child to her first dental appointment and enrolled her in daycare. *Id.* at 204, 211. Foster Mother testified that Early Intervention Services were in place when Child first came into care, and Foster Parents continued with Early Intervention Services tracking. *Id.* at 205-206. Early Intervention Services tracking was discontinued in October 2020 because Child reached all of her developmental milestones. *Id.* at 206.

At the February 1, 2022 hearing, Maternal Grandmother testified that she is currently retired from the military and legally separated from her husband, K.B. N.T., 2/1/22, at 4. Maternal Grandmother did not see Child before Child was placed in WCCB custody. *Id.* at 20. Maternal Grandmother testified that WCCB informed her that Mother objected to Maternal Grandmother visiting with Child; however, Maternal Grandmother also

- 6 -

testified that Mother told her "quite the opposite[.]" *Id.* at 21.  When Mother agreed to supervised visitation, Maternal Grandmother began visits with Child. *Id.* at 23.

Maternal Grandmother was aware of Mother's allegation that K.B. sexually abused Mother, but Maternal Grandmother believed it was "logistically impossible" for the abuse to have occurred and testified that Mother admitted the allegation was a lie. *Id.* at 13-14.  Even though Maternal Grandmother is legally separated from her husband, he has stayed overnight at her home. *Id.* at 74.  Maternal Grandmother planned to adopt Child on her own, emphasizing that she is Child's family and she believes that Child "will be happiest growing up in [a] family" that loves her. *Id.* at 39 and 89-90.

By order dated February 7, 2022, and entered on February 10, 2022, the trial court denied Maternal Grandmother's petition for adoption.  Maternal Grandmother timely filed a notice of appeal with a concise statement of errors complained of on appeal.  The trial court issued a statement in lieu of a Rule 1925(a) opinion, noting that the reasons that support its order are contained in the trial court's Memorandum and Order ("Trial Court Opinion"), dated February 7, 2022.

On appeal, Maternal Grandmother raises the following issue for our review:

> 1. Whether the trial court abused its discretion in denying [Maternal] Grandmother's adoption petition, where the overwhelming evidence shows that granting [Maternal Grandmother's] adoption petition was in the best interest of

[Child], due to [Maternal] Grandmother's superior ability, propriety and familial willingness to adopt [ ] Child?

Maternal Grandmother's Brief at 6 (unnecessary capitalization omitted).

This Court reviews an adoption determination for an abuse of discretion. *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016). We will not conclude that there is an abuse of discretion "merely because a reviewing court would have reached a different conclusion." *Id.* (citation omitted). Rather, "[a]ppellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *Id.* (citation omitted).

We have stated, "[i]n both custody and adoption matters, our paramount concern is the best interests of the child. This 'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being." *In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa. Super. 1996) (citations omitted); *see also* 23 Pa.C.S.A. §§ 2724(b) and 2902(a).

When this Court reviews a trial court's "best interests" analysis in custody and adoption matters, our scope of review is as follows:

An appellate court is not bound by findings of fact made by the trial court which are unsupported in the record, nor is it bound by the court's inferences drawn from the facts. However, on issues of credibility and weight of the evidence, an appellate court defers to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. Only where it finds that the custody order is manifestly unreasonable

as shown by the evidence of record will an appellate court interfere with the trial court's determination.

**A.S.H.**, **supra** at 700 (citations and internal quotation marks omitted).

This Court also held that "once the parental rights have been terminated, anyone may become an adoptive parent, and the best interest of the child is the controlling factor by which a court must be guided." **In re Adoption of D.M.H.**, 682 A.2d 315, 319 (Pa. Super. 1996).

In the instant matter, the trial court made the following determination based on the evidence of record:

> Based upon the evidence presented, the [c]ourt finds that the physical, mental, and emotional needs and welfare of the [C]hild would be best served through the adoption by the Foster [Parents]. According to the testimony of Dr. Rosenblum and Ms. Eckenrod, the [C]hild has a secure attachment to the Foster [Parents], and a beneficial bond has formed and shown them to be an intact family at this point in time. The Foster [Parents have] nurtured the [C]hild from her previous physical state as a "failure to thrive" child to a healthy child, demonstrating the ability to provide for her physically as well. It is the [c]ourt's belief that the [C]hild will continue to grow and thrive in the home of the Foster [Parents], which has served as a home for the [C]hild since the time that she was approximately nine months old.

Trial Court Opinion, 2/7/22, at 4.

Maternal Grandmother contends that the trial court ignored the evidence demonstrating that adoption by Maternal Grandmother would be in Child's best interest. Maternal Grandmother's Brief at 18. First, while Maternal Grandmother does not assert that Foster Parents have been deficient in meeting the Child's needs, Maternal Grandmother claims to have a superior ability to care for Child based on her years of experience as a foster parent

and adoptive parent. *Id.* 18-19, 22. Second, Maternal Grandmother claims she has the "familial willingness" to adopt Child as she is Child's family and can promote contact with Mother, Foster Parents, and Maternal Grandmother's extended family. *Id.* at 18-19. After careful review, we discern no abuse of discretion or error of law by the trial court.

First, the record belies Maternal Grandmother's claim of having a superior ability to care for Child based on her experience as a caregiver. Ms. Eckenrod, the trauma mental health counselor and visitation supervisor at King and Associates, testified that she supervised fourteen of Maternal Grandmother's visits with Child beginning in November 2020. N.T., 12/9/21, at 13, 95. During Maternal Grandmother's initial visit with then one-year-old Child in November 2020, Ms. Eckenrod identified safety concerns when Maternal Grandmother was feeding Child. *Id.* at 16. Ms. Eckenrod testified that during Child's mealtime, Maternal Grandmother would not always cut the appropriate amount of food. *Id.* Ms. Eckenrod testified that because Child "has sensory issues when it comes to swallowing" and is "developmentally unable to chew and swallow big bites," Child needs "things to be cut up very small." *Id.* Ms. Eckenrod testified she had to remind Maternal Grandmother to cut up certain foods for Child. *Id.* During this initial visit, Maternal Grandmother needed instruction from the visitation supervisor on how to safely feed Child, who, as mentioned above, has special needs and was only one year old.

Ms. Eckenrod recalled a subsequent visit during which she provided Maternal Grandmother assistance on how to engage Child in a developmentally appropriate manner. Ms. Eckenrod testified that during a visit in May 2021, Maternal Grandmother did not actively assist then two-year-old Child to eat with her utensil. *Id.* at 38-40. Ms. Eckenrod testified that Maternal Grandmother "would let [Child] do it on her own rather than helping her, . . . , get a piece on her fork and then putting it in her mouth." *Id.* at 40. Ms. Eckenrod testified that it was not developmentally appropriate for Child to try to feed herself. *Id.* Ms. Eckenrod noted that Child was at a stage in which she was developing her fine motor skills, but she had not attained those skills yet. *Id.* Ms. Eckenrod testified that she modeled the appropriate behavior for Maternal Grandmother by sitting at the table, placing the fork in Child's hand, helping Child eat, and offering Child positive praise. *Id.* Maternal Grandmother did not follow Ms. Eckenrod's lead. *Id.* Ms. Eckenrod testified that Maternal Grandmother "does not show an understanding of developmental phases" and that Maternal Grandmother "often does things for an older child" rather than one of Child's age. *Id.* at 33.

In addition, Maternal Grandmother has shown a lack of appropriate judgment regarding Child's dietary needs during her supervised visits. Ms. Eckenrod testified she became concerned when Child did not eat during visits "because she is a failure to thrive child." N.T., 12/9/21, at 33. She testified

- 11 -

that when Child did not eat, Ms. Eckenrod had to intervene to motivate Child to eat because Maternal Grandmother would not "re-encourage" Child to eat. *Id.* Ms. Eckenrod testified that when Child was not eating, Maternal Grandmother would "minimize it and move on," and she would rarely try to encourage Child to eat. *Id.* at 34. Further, Ms. Eckenrod testified that Maternal Grandmother brought foods that were high in sugar, which was not appropriate for then two-year-old Child. *Id.* at 31-32, 39. Ms. Eckenrod explained to Maternal Grandmother that the dietician recommended limitations on Child's juice intake. *Id.* at 39. Ms. Eckenrod spoke to Maternal Grandmother about limiting juice and sugar for Child and suggested providing Child with a healthier option. *Id.* at 32, 39. She informed Maternal Grandmother that they "had documentation from [Child's] dietician, and if she wanted it, she was more than welcome to have it." *Id.* at 70. Maternal Grandmother never requested such documentation. *Id.*

Ms. Eckenrod further testified about additional visits during which Child's safety was an issue. During several visits, Maternal Grandmother allowed Child to drink from a straw and eat snacks while walking and playing. N.T., 12/9/21, at 16, 32. Ms. Eckenrod testified that both activities were choking hazards for Child. *Id.* Ms. Eckenrod also testified that when a visit occurred in a park where other children were present, Maternal Grandmother became engaged with the other children and did not keep an eye on Child at times.

*Id.* at 42-43, 86. Ms. Eckenrod testified that she intervened to stop Child from straying or to bring Child back. *Id.* at 43, 86.

Ms. Eckenrod's observations from the supervised visits contradict Maternal Grandmother's claim of a superior ability to care for Child. Given Child's failure to thrive diagnosis and history of lack of weight gain, Maternal Grandmother's seeming indifference to Child's reluctance to eat and Child's recommended diet is concerning. Ms. Eckenrod's testimony also highlighted Maternal Grandmother's inattention to ensuring Child's overall safety and well-being. Ms. Eckenrod testified that while Maternal Grandmother has the "loving and caring skills as a grandmother," "she does not have the ideas of a parental role for this [C]hild." *Id.* at 94. Ms. Eckenrod defined a parental role as one that involves setting "boundaries for a child," "following through with the doctor's recommendations," and "understanding the developmental phases." *Id.* at 61. Ms. Eckenrod testified that when she tried to speak with Maternal Grandmother about these issues, Maternal Grandmother was minimally compliant with her instructions. *Id.* at 61-62. Ms. Eckenrod testified that Maternal Grandmother has not demonstrated the long-term parenting techniques that would help Child become successful. *Id.* at 95. Therefore, the record does not support Maternal Grandmother's claim of superior parenting skills or an exceptional ability to care for Child.

Second, Maternal Grandmother contends that she is Child's family and can provide Child access to Mother, Foster Parents, and Maternal

Grandmother's extended family. Maternal Grandmother's Brief at 19. Her contention fails.

While Maternal Grandmother contends that she is Child's family, Maternal Grandmother's Brief at 19, this Court has held that "[t]he goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." *In re K.D.*, 144 A.3d at 153 (citation omitted).

The record shows that Child and Maternal Grandmother do not have a meaningful parent-child bond. Ms. Eckenrod testified that Child has a "very superficial" and "surface level relationship" with Maternal Grandmother. N.T., 12/9/21, at 46, 59, and 63. She testified that Child would rarely seek out Maternal Grandmother for attention. *Id.* at 46. Ms. Eckenrod testified that after supervising approximately thirteen months of visits, she saw only minimal change in their relationship. *Id.* at 59. In Ms. Eckenrod's view, Maternal Grandmother's visits did not resemble a parent-child encounter due to the lack of structure, routine, and healthy parenting skills. *Id.* She noted that Maternal Grandmother's relationship with Child was similar to that of a daycare worker. *Id.* at 63.

Ms. Pulice, visitation specialist at King and Associates, supervised Maternal Grandmother's most recent visit with Child on December 30, 2021. N.T., 1/21/22, at 46-47. Ms. Pulice observed that Child did not show any

affection when she first saw Maternal Grandmother. *Id.* at 47. She also noted that there was no change in Child's face and no smile; instead, Child looked directly at Ms. Pulice. *Id.* Ms. Pulice testified that Child called out for "mom" or "mommy" about fifteen times throughout the visit, and Child often looked to Ms. Pulice for approval. *Id.* at 53, 56. Ms. Pulice stated that when Child left Maternal Grandmother, Child did not say that she wanted to stay. *Id.* at 56-57.

Dr. Rosenblum conducted the bonding assessment between Child and Maternal Grandmother and Foster Parents in July 2021. *Id.* at 10. When asked about Child's reaction to Maternal Grandmother on direct examination, Dr. Rosenblum testified that "there was no affection." *Id.* at 19-20. He observed that Child was "ill at ease" and showed "signs of distress." *Id.* at 20. Dr. Rosenblum did not consider Maternal Grandmother an attachment figure for Child and concluded that Maternal Grandmother did not form a close or strong attachment to Child. *Id.* at 20, 26-27, 44.

Further, there is evidence that the visits with Maternal Grandmother corresponded with negative behavioral changes in Child. Ms. Ratica, director of Child's former daycare center, testified that Child attended her daycare from November 2019 until September 2021. N.T., 12/9/21, at 108, 112. On days that Child visited with Maternal Grandmother, Child left the daycare center to attend the visit, and, on most days, Child returned to daycare after the visit concluded. *Id.* at 109-110. Ms. Ratica described Child generally as

"very social" and as a child who did not display stranger anxiety. *Id.* at 109. However, when Ms. Ratica took Child to meet the driver who transported Child to her visits with Maternal Grandmother, Child would cry, wave her hands, and say "no." *Id.* When asked about Child's behavior when she returned from her visits, Ms. Ratica testified as follows:

Q.     How was she when she would come back?

A.     When she would come back, she was aggressive with her friends.  She would start pushing, shoving, throwing toys more.  Refusing to do simple things even like sitting down for snack.  She would throw herself on the floor.  Her behavior was completely different compared to before she left.

*Id.* at 110.

Ms. Ratica testified that Child did not exhibit such behaviors on days when there were no visits. *Id.* Child's behavior after visits with Maternal Grandmother was consistent regardless of who transported Child to the visit. *Id.* at 121. Ultimately, the record does not show a meaningful relationship between Maternal Grandmother and Child.

It is undisputed that Foster Parents have established a healthy bond with Child. "[T]he existence of an emotional bond between the child and one of the prospective custodial parents is an important factor." *A.S.H.*, 674 A.2d. at 700. Foster Parents are married and have been in a relationship for more than five years. N.T., 12/9/21, at 197. Foster Parents have been caring for Child since she was approximately eight months old. *Id.* at 128. Child refers to Foster Parents as "mommy" and "daddy." *Id.* at 149; N.T., 1/21/22, at

101-102. Foster Parents also have a three or four-month-old foster child, E.J., whom Child loves and refers to as her "baby" or her "brother." N.T., 12/9/21, at 200. Maternal Grandmother did not demonstrate evidence of a similar attachment between herself and Child or between Child and any member of Maternal Grandmother's extended family. *See D.M.H.* 682 A.2d 319-320 (finding that "a live-in relationship with a direct sibling is far more powerful than occasional or even regular visits with cousins or other similarly distant family members"); *see generally A.S.H.*, 674 A.2d at 700-701 (upholding trial court's decision to place greater weight on familial bond with Herring where the child called Herring "mommy" and Herring's daughter as "sister").

Dr. Rosenblum testified that Child appeared very happy, relaxed, and secure with Foster Parents. N.T., 1/21/22, at 13-14. Dr. Rosenblum testified that Child "already has a very secure attachment with a family that loves her and where she feels totally safe and where she is thriving." *Id.* at 35. Dr. Rosenblum recommended that Child remain with Foster Parents. *Id.* at 44-45. He testified that Foster Parents are "the most suitable people, by far, to pursue a goal of adoption." *Id.* at 45.

Similarly, Ms. Hudock, the WCCB caseworker, testified that Child goes to "[F]oster [P]arents for love and security" and that Foster Parents "are her everything." N.T., 12/9/21, at 129. Ms. Hudock testified that her recommendation is for Child to be adopted by Foster Parents. *Id.* at 151. She did not recommend that Child be adopted by Maternal Grandmother. *Id.* at

149.    When asked about her reasons on direct examination, Ms. Hudock

testified:

> The [C]hild has been in agency custody and in the current foster home for 26 months.  This home is all she knows.  She refers to the [F]oster [P]arents as her mommy and daddy.  She goes to them for love, comfort, and support. She has grown and developed in their home and they are considered to be her parents.  They have continued to take care of her for the last 26 months.  This is a child with failure to thrive that continues to need medical attention.  It is an ongoing battle [for which] we as an agency and the [F]oster [P]arents continue to seek treatment, and it is a very difficult matter and they have done amazing with that, and she is doing very well.

*Id.* at 149-150.

Ms. Eckenrod testified that Foster Parents have met Child's emotional

needs, and that Child has a secure and healthy attachment with Foster

Parents.  *Id.* at 64, 94-95.  Notably, Maternal Grandmother acknowledged

that Child has formed a healthy attachment with Foster Parents.  N.T., 2/1/22,

at 78.

Moreover, Dr. Rosenblum testified that he would not consider it an

advantage for Child to live with Maternal Grandmother.  N.T., 1/21/22, at 35.

He explained that Child "already had a very secure attachment with a family

that loves her" and "the most important thing for a child is to have as much

continuity and stability in their early years as possible."  *Id.* at 34-35.  He

testified that "[a]ttachment becomes more secure when it can be on a

continuous, ongoing basis from an early age."  *Id.* at 34.  Dr. Rosenblum

testified that "children who are removed after a primary attachment has been

- 18 -

formed are very much at risk for an attachment disorder, or emotional distress, regression." *Id.* at 41. On cross-examination, Dr. Rosenblum testified that placing Child with Maternal Grandmother "would come at a cost to the [C]hild" and "a likelihood it would cause trauma." *Id.* at 71-72.

Moreover, on direct examination, Dr. Rosenblum was asked whether Maternal Grandmother demonstrated the skills that would help Child if Maternal Grandmother were permitted to adopt Child. *Id.* at 42. In response, Dr. Rosenblum testified that he found Maternal Grandmother to be "well-intentioned[ ] but misguided" and that Maternal Grandmother "has difficulty separating her own emotional needs from the emotional needs of [Child]." *Id.* at 42. He stated that Maternal Grandmother felt that her relationship with Child "is the most important relationship in her life," and it has "given her a purpose." *Id.* Dr. Rosenblum testified that Maternal Grandmother is "not focused on what is in [Child]'s best emotional interest and well-being." *Id.*

Maternal Grandmother presently asserts that she is willing to allow Mother to have contact with Child. Maternal Grandmother's Brief at 19, 21. The record, however, shows that Maternal Grandmother has not maintained a consistent position on this issue. Ms. Hudock testified that she attended a custody conciliation conference with Maternal Grandmother. N.T., 12/9/21, at 146-148. At the conference, Maternal Grandmother said she would not continue Child's contact with Mother. *Id.* at 148. Further, during the bonding assessment with Dr. Rosenblum, Maternal Grandmother reported that she

would allow Mother to have "some contact" with Child, but the visits would need to be supervised by someone other than Maternal Grandmother. N.T., 1/21/22, at 33. Dr. Rosenblum testified that Maternal Grandmother is unwilling to supervise the visits herself because she is afraid Mother might make an allegation against her. *Id.* at 33-34.

Foster Parents, on the other hand, have taken affirmative steps to ensure Mother continues to have a place in Child's life. Foster Parents drafted a post adoption contact agreement ("PACA") with Mother in 2021. N.T., 12/9/21, at 215. Foster Mother testified that the draft agreement allows for a minimum of two updates per year, one physical visit per year, and another update around the time of Child's birthday. *Id.* Foster Mother also testified that she has had "pretty regular contact with [M]other" since the agreement was drafted in April or May 2021. *Id.* She testified that Mother has had virtual visits at least twice a month since the July termination hearing, and there had been one supervised in-person visit in November for about two hours. *Id.* at 215-216.

In reaching its decision, the trial court properly considered the recommendation of Child's GAL. The GAL stated that it would be in Child's best interest to be adopted by Foster Parents. N.T., 2/1/22, at 103. She also stated that it would be in Child's best interest to continue to have some contact with Mother and Maternal Grandmother, but only on the terms with which Foster Parents are comfortable. *Id.* at 104. The trial court has "the duty to

consider the statements and opinions of the [GAL] when making its determination of which family would better serve the bests interests of the child." *In re K.D.*, 144 A.3d at 153 (citation omitted). Here, the trial court properly considered the recommendation of the GAL and agreed that "it would be in the child's best interest for all of the petitioners in this matter to maintain contact with the child moving forward." Trial Court Opinion, 2/7/22, at 3. The court went on to state that it "is cognizant, however, of the limitations of its statutory authority in the present circumstance, where only one petitioner will be ultimately responsible for determining who is permitted to maintain contact with the child and under what circumstances." *Id.* at 3-4. We discern no error in the court's consideration of the GAL's recommendation.

The trial court also considered Maternal Grandmother's years of experience as a foster parent and adoptive parent. Trial Court Opinion, 2/7/22, at 1, 3. The court considered Maternal Grandmother's testimony that she would be able to provide a loving and safe environment for Child, has the means to provide for Child, and is open to maintaining contact with Mother and Foster Parents. *Id.* at 3. The trial court did not find that Maternal Grandmother was somehow inappropriate for Child or that she was unable to provide a loving and caring home for Child. *Id.* at 4. In adoption cases, however, the primary concern is the best interests of the child, which is a determination made on a case-by-case basis. *A.S.H.*, 674 A.2d at 700. Here, the court ultimately found that Foster Parents' secure bond with Child and

their demonstrated ability to care for and nurture Child weighed in favor of adoption by Foster Parents rather than Maternal Grandmother.

Maternal Grandmother contends that WCCB and Foster Parents are responsible for the absence of a significant bond between herself and Child. Maternal Grandmother's Brief at 22. This contention misses the mark, however. The court must decide whether to grant or deny an adoption petition based on the physical, mental, and emotional needs and welfare of the child. *See* 23 Pa.C.S.A. § 2724(b); *In re K.D.*, 144 A.3d at 152-153.[2]

Maternal Grandmother also criticizes Foster Parents for not considering a post adoption contact agreement with Maternal Grandmother at this time. *See* Maternal Grandmother's Brief at 19, 21. This Court has held that an "open adoption is a purely voluntary arrangement requiring the consent of the adoptive parents in order to enter into an agreement with birth relatives for ongoing communication or contact that is in the best interest of the child." *In re Adoption of G.L.L.*, 124 A.3d 344, 348 (Pa. Super. 2015); *see* 23 Pa.C.S.A. § 2735. Here, the trial court correctly recognized the "limitations of its statutory authority in the present circumstance, where only one petitioner will be ultimately responsible for determining who is permitted to maintain

---

[2] Ms. Hudock testified that initially both of Child's Parents declined to have Maternal Grandmother see Child, and WCCB honored Parents' request. N.T., 12/9/21, at 137. Ms. Hudock testified that when Child's dependency matter began moving towards termination of parental rights, WCCB offered Maternal Grandmother visits to start building a relationship with Child. *Id.* at 137-138.

contact with the child and under what circumstances." Trial Court Opinion, 2/7/22, at 3-4.

Moreover, Foster Mother testified that she would not consider a PACA with Maternal Grandmother at this time due to concerns arising from the visits and due to Mother's request. N.T., 12/9/21, at 226. Foster Mother testified there were "concerns that have come up through different visits," and she witnessed some behaviors after the visits. *Id.* She identified Child's emotional state as a concern as Child "seems distressed a lot." *Id.* Foster Mother also testified that Mother did not want contact with Maternal Grandmother, and Foster Mother wished to keep the bond with Mother intact. *Id.*

Foster Father also testified that he would not consider a PACA with Maternal Grandmother because of the wishes of Mother. N.T., 1/21/22, at 106. He further testified that he believed it would be more beneficial for Child to have a relationship with Mother rather than Maternal Grandmother. *Id.* at 107. When asked whether he would reconsider contact with Maternal Grandmother if, in the future, a relationship would not be disruptive, Foster Father testified that it would depend on different factors. *Id.* Foster Parents did not wish to pursue a PACA with Maternal Grandmother at this time, and it was within their discretion to do so. *See generally A.S.H.*, 674 A.2d at 701 (upholding trial court's finding that "the issue of contact with biological

relatives would be best addressed by the adoptive parent as the child progresses").

For the foregoing reasons, we conclude that the trial court properly reviewed the evidence of record and correctly determined that denial of Maternal Grandmother's petition for adoption would serve Child's best interests. We discern no abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/24/2022